PENNSYLVANIA DENTAL ASSOCIA-
TION; Delaware County Dental Socie-
ty; Erie County Dental Association,
Inc.; Harrisburg Area Dental Society;
Luzerne County Dental Society; Mont-
gomery-Bucks Dental Society; Odonto-
logical Society of Western Pennsylva-
nia; Scranton Dental Society; and
York County Dental Society; Third-
Party Plaintiffs,

v.

MEDICAL SERVICE ASSOCIATION OF
PENNSYLVANIA, d/b/a Pennsylvania
Blue Shield; and Donald S. Mayes,
D.D.S., in his Individual Capacity;
Third-Party Defendants.

Civ. A. No. 81–1187.

United States District Court,
M.D. Pennsylvania.

Oct. 28, 1983.

Thomas A. Beckley, John G. Milakovic, Beckley & Madden, Harrisburg, Pa., Charles F. Scarlata, Scarlata & DeRiso, Pittsburgh, Pa., for third-party plaintiffs; Barry E. Carter, Washington, D.C., of counsel.

William H. Wood, William E. Miller, Jr., Thomas E. Wood, Keefer, Wood, Allen & Rahal, Harrisburg, Pa., Joseph Friedman, Stephen F. Ban, Michael J. Hennessy, Springer & Perry, Pittsburgh, Pa., for third-party defendants.

## MEMORANDUM

CALDWELL, District Judge.

The third-party defendants, Medical Service Association of Pennsylvania d/b/a Pennsylvania Blue Shield (hereinafter Blue Shield) and Donald S. Mayes, D.D.S., have filed a motion for summary judgment as to the claims asserted in the third amended third-party complaint (TATPC) of the third-party plaintiffs,[1] filed on November 30, 1982. This opinion addresses that motion.

The Commonwealth of Pennsylvania initiated this civil action on October 20, 1981, by filing a complaint against the Pennsylvania Dental Association (PDA) and a number of other dental associations, contending that these associations were violating antitrust laws, principally by encouraging dentists to terminate Blue Shield participating dentist agreements. The Associations filed answers to the complaint on or about November 9, 1981.

On November 17, 1981, the Associations filed the third-party complaint at issue here naming, *inter alia*, Pennsylvania Blue Shield and Donald S. Mayes, D.D.S. as third-party defendants. Blue Shield moved to dismiss the third-party complaint on December 7, 1981. On March 1, 1982, Blue Shield's motion was denied except with respect to paragraph 12 of the third-party complaint. This third-party complaint, like other pleadings in this case, has been amended a number of times.

On March 11, 1982, Blue Shield filed its answer and counterclaim to the third-party complaint naming the defendant Dental Associations and an additional Dental Association (Fifth District Dental Society) as counterclaim defendants and naming several individuals as additional defendants on the

---

1. The third-party plaintiffs are the Pennsylvania Dental Association (hereinafter PDA), Delaware County Dental Society, Erie County Dental Association, Inc., Harrisburg Area Dental Society, Luzerne County Dental Society, Montgomery-Bucks Dental Society, Odontological Society of Western Pennsylvania, Scranton Dental Society and York County Dental Society.

counterclaim.[2] Counterclaim defendants moved to dismiss Blue Shield's counterclaim, which motion was denied by order of July 30, 1982. On September 20, 1982, the counterclaim defendants filed a responsive pleading to Blue Shield's counterclaim, which included a class action counterclaim against Blue Shield and Dr. Mayes brought by PDA and three other Dental Associations.

On September 15, 1982, Blue Shield filed a motion for a preliminary injunction. On November 17, 1982, PDA filed a motion for a preliminary injunction. On December 30, 1982, both the motions of Blue Shield and of PDA for preliminary injunctions were denied.

On November 22, 1982, the Court granted a joint motion of the Commonwealth and the Dental Associations dismissing the initial complaint on the basis of a settlement agreement.

On January 25, 1983, the class plaintiffs filed a motion for class certification. On April 6, 1983, that motion was denied in part and granted in part, the Court denying class certification completely to one subclass and certifying another subclass for injunctive relief only. That order was appealed to the Third Circuit Court of Appeals on April 13, 1983. On April 26, 1983, Blue Shield and Dr. Mayes filed a motion to dismiss the appeal and on May 24, 1983, the appeal was dismissed.

PDA is a non-profit corporation under Pennsylvania law and is an association of dentists, most of whom are licensed to practice in Pennsylvania. TATPC, 3(A), page 3. The other third-party plaintiffs (hereinafter referred to as plaintiffs) similarly are non-profit corporations composed of dentists. TATPC, 3(B–I), pages 3–5. Blue Shield is a health service corporation formed and operating under the laws of Pennsylvania. 40 Pa.C.S. § 6301 *et seq.* Dr. Mayes is a vice president in charge of dental affairs of Blue Shield.

In the third-party complaint (hereinafter referred to as the complaint), the plaintiffs allege in Count I that "since at least 1974 and continuing to the present, Blue Shield, certain Pennsylvania dentists, and other co-conspirators have been and are involved in practices which vertically fix the price of prepaid dental care in the Commonwealth of Pennsylvania, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1." Blue Shield is alleged to fix the price of prepaid dental care vertically by use of "usual, customary and reasonable" (UCR) method of payment for services rendered by dentists to patients covered by a Blue Shield plan, and by coercing dentists who have not entered into a provider agreement with Blue Shield (pursuant to which dentists agree to accept Blue Shield's UCR-based reimbursement figure as payment in full for a given service to a patient) to charge no more than the UCR rate. TATPC, 9(A, B), pages 8–9. The plaintiffs allege that the defendants seek to coerce dentists who are not contractually obligated to charge no more than the UCR rate by having these dentists boycotted by their patients and their potential patients. TATPC, 10, pages 9–10. They allege that a Blue Shield plan known as Dental PLUS, which provides for a covered patient in the plan to receive insurance coverage for dental services only if the patient utilizes participating dentists, constitutes a boycott in violation of 15 U.S.C. § 1.

Count II of the complaint is based upon 15 U.S.C. § 2 and alleges that Blue Shield is engaged in an attempt to monopolize the "statewide (i.e., Pennsylvania) market for the provision of dental care through third-party payers" and that there is a dangerous probability that Blue Shield will succeed in its attempt. In Count II, plaintiffs aver that 1,210,000 of the 3,280,000 citizens of Pennsylvania who are covered by prepaid dental care programs are covered by Blue Shield, and that almost all dentists provide services to Blue Shield covered patients. They further aver that most dentists have signed provider agreements with

**2.** On March 12, 1982, Blue Shield commenced a separate action by complaint identical to its counterclaim which was consolidated with the case at bar.

Blue Shield, and that other than Blue Shield's 1,210,000 insureds there are only 90,000 insureds in Pennsylvania who are covered by prepaid dental care programs through health service corporations. They contend that Blue Shield's practices and policies described in the first count of their complaint are prescribed or followed by Blue Shield in its effort to monopolize the statewide market for the provision of dental care through third-party payers and that this is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

In Count III of their complaint, plaintiffs contend that Blue Shield has established an actual monopoly of a market in violation of 15 U.S.C. § 2. The relevant market, for purposes of Count III of plaintiffs' complaint, is described as, "... among others, the provision of prepaid dental care through health service corporations in Pennsylvania." TATPC, 33, page 18.

Count IV of the complaint charges the defendants with the state law torts of malicious abuse of civil process (for instigating the present litigation) and interference with business and contractual relationships between dentists and their patients.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is to be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to a judgment as a matter of law. Rule 56(e) provides that when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided by Rule 56, must set forth specific facts showing that there is a genuine issue for trial.

Rule 401.4 of the Rules of Court for the Middle District of Pennsylvania provides:

> 401.4 Motions for Summary Judgment. Upon any motion for summary judgment pursuant to Fed.R.Civ.P. 56, there shall be annexed to the motion a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.
>
> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.
>
> All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.[3]

**3.** Rule 401.4 obviously serves an important function in connection with any summary judgment motion. It permits the Court to determine efficiently and precisely which material facts are in dispute and which are not. The rule is particularly important in a complex case like this one which involves thousands of pages of depositions, documents and other materials arguably or potentially relevant to a summary judgment motion, and involving a plethora of contentions and claims most of which the plaintiffs have not articulated with precision and clarity. Appended as Exhibit N to their motion for summary judgment, defendants have filed a statement of material facts pursuant to Rule 401.4. Appended as Exhibit F to their brief in opposition to the motion, the plaintiffs have filed a counterstatement of material facts. A review of the statements submitted by defendants and plaintiffs reveals that plaintiffs have made no reasonable effort to agree to facts that

are not in dispute, and instead have caused it to appear that facts are in dispute when they are not. The Court has examined these two sets of 87 numbered paragraphs submitted by defendants and plaintiffs. In most of its numbered paragraphs, Blue Shield has set forth a clearly stated fact or set of facts. In none of PDA's corresponding paragraphs is it indicated that Blue Shield's statement is undisputed, even though many of the paragraphs can not reasonably be disputed and even though PDA frequently, in other numbered paragraphs of its own, sets forth exactly the same facts. It is confusing and serves no worthwhile purpose for purposes of Rule 56 and Local Rule 401.4 for a party opposing summary judgment to refuse to acknowledge the existence of a fact advanced by a moving party if that fact can be established by the moving party and the opposing party has no evidence to refute it. If the asserted fact is not

In analyzing the defendants' motion herein, the Court will rely upon those facts set forth in defendants' Rule 401.4 statement of facts and will also accept as true those specific facts asserted by plaintiffs to be material and in dispute if the plaintiffs have pointed with clarity to evidence acceptable under Rule 56 of the Federal Rules of Civil Procedure to establish such facts. The Court will not accept plaintiffs' conclusions as to those issues which are either ultimate issues of fact or legal issues in the absence of supporting specific facts, nor will the Court accept plaintiffs' general references to entire depositions or groups of depositions as establishing specific factual points.

Blue Shield is a non-profit "professional health service corporation" operating under a state regulatory act. 40 Pa.C.S. §§ 6301–6334. It has a thirty-two member board of directors. Sixteen are lay persons and sixteen are doctors (two of whom are dentists).

The Blue Shield practices, some or all of which are alleged by the plaintiffs to constitute or assist efforts to restrain trade, to monopolize or to boycott, are set forth at length in Exhibit N to defendants' motion, and the factual descriptions of the nature of the practice are essentially not disputed in Exhibit F to plaintiff's brief.

Blue Shield's share of the market consisting of all dental prepayment plans offered by all third-party payers in Pennsylvania is no greater than 40%. Entry into the Pennsylvania dental prepayment market by health and accident insurers is unrestricted. Blue Shield purchases, on behalf of its subscribers, less than 9% of all of the dental care that is purchased in Pennsylvania.

A dentist may choose to become a participating dentist. A participating dentist agrees with Blue Shield to accept the Blue Shield reimbursement for a particular dental procedure as full payment for that procedure. A participating dentist is paid directly by Blue Shield. When a non-participating dentist treats a patient who is a Blue Shield subscriber, Blue Shield does not pay the dentist directly, but instead pays the subscriber the amount of the Blue Shield reimbursement. The Blue Shield reimbursement may well be less than the fee charged by the non-participating dentist.

The Blue Shield reimbursement for a particular procedure is calculated by a procedure known as the "UCR" (usual, customary and reasonable) reimbursement system. The basic rule is that a dentist is reimbursed his "usual" charge for a given dental service. The dentist's usual charge is his most frequent charge for that service.[4] However, Blue Shield has calculated a "customary" charge for each dental service, that being the ninetieth percentile of all "usual" charges for all dentists throughout Pennsylvania who practice the same specialty. Blue Shield will not ordinarily reimburse a dentist more than the "customary" charge.[5] Blue Shield subscribers are assured by this system that their covered dental services will be paid for in full if they are treated by a participating dentist. A Blue Shield subscriber is a member of a group which has contracted with Blue Shield for a prepaid dental service plan for the members of the group.

Blue Shield's ordinary contract with participating dentists requires those dentists to permit Blue Shield to inspect their books

---

material, that is a matter for argument. If the asserted fact is material but the opposing party feels that additional facts relating to the same subject matter as the asserted fact are also material, the opposing party need only (by affidavits, argument, etc.) demonstrate the existence of disputed issues of material fact.

**4.** Blue Shield employs a formula to calculate the "usual" charge, pursuant to which the dentist's charges for a given service for the preceding calendar year and the first three months of the current calendar year are utilized. The "usual"

charge is set at the seventy-fifth percentile of those charges. A listing of a dentist's usual charges for the range of services the dentist provides, so calculated, is known as the dentist's profile. Profiles are updated annually.

**5.** A dentist may be reimbursed more than the customary charge upon a demonstration of special circumstances relating to the particular service provided. We believe this to be the "reasonable" element of the UCR procedure.

and records. Blue Shield's stated reason for this practice is to insure that reported usual charges are accurate and that Blue Shield subscribers are not charged more for a given service than other dental patients.[6] If a participating dentist does not cooperate, his profile may be frozen. Blue Shield seeks to inspect the books and records of non-participating dentists, it says, for the same reasons.[7] When a non-participating dentist refuses such an inspection, Blue Shield frequently reacts by freezing that dentist's profile. When a dentist's profile is frozen, Blue Shield will not increase the amount of reimbursement for that dentist based upon newer and higher usual charges.

■ The two basic elements of a cause of action under Section 1 of the Sherman Act are, first, that the defendant(s) entered into a contract, combination or conspiracy and, second, that the contract, combination or conspiracy restrains trade. *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440 (3d Cir.1978); *Medical Arts Pharmacy v. Blue Cross & Blue Shield*, 518 F.Supp. 1100 (D.Conn.1981). The United States Supreme Court, early in the history of the Sherman Act, interpreted the Section 1 prohibition to require an analysis addressed to the reasonableness of a trade restraint, since virtually all contracts can be viewed to restrain trade in some respect. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). While some business practices, such as horizontal price fixing among competitors,[8] have been judicially determined to be unreasonable *per se* "because of their pernicious effect on competition and lack of any redeeming virtue," *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), the categories of *per se* antitrust violations are nar-

rowly and carefully defined, and most allegations that particular business practices constitute antitrust violations are to be analyzed under the "rule of reason." Under this rule, the essential analysis is whether the practice in question is anticompetitive. *See, National Society of Professional Engineers v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978).

... not every agreement that has an impact on price, either vertically or horizontally, is a *per se* violation of the Sherman Act. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979). For example, a contract for the sale of goods 'fixes' the price at which the goods are to be sold, but such a contract is not *per se* illegal, absent a showing of some adverse impact on competition. *Cf. United States v. Topco Associates Inc.*, 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). The proper inquiry, thus, is not whether a particular agreement literally fixes a price, but whether the agreement is so 'plainly anticompetitive' and so very likely without 'redeeming virtue' that a court will apply the label '*per se* price fixing.' *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, *supra*, 441 U.S., at 8–9, 99 S.Ct. at 1556–1557.

*Medical Arts Pharmacy v. Blue Cross & Blue Shield, supra*, 518 F.Supp. at 1106.

■ The analysis of the defendants' motion must proceed with the thought in mind that summary judgment in an antitrust case is to be sparingly granted, particularly if it appears that there are factual questions presented as to the motive and intent of alleged conspirators, *Poller v. Columbia*

---

6. One of the provisions of the standard agreement between Blue Shield and a participating dentist is that the dentist will not charge a Blue Shield subscriber more than a non-subscriber for the same service.

7. Non-participating dentists are "profiled" as to their usual charges the same as participating dentists by Blue Shield. Non-participating den-

tists have no agreement with Blue Shield, but Blue Shield will not reimburse a subscriber who is treated by a non-participating dentist more than that dentist's "usual" charge.

8. *See, Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980).

*Broadcasting,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). "Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even-handed justice'." *Poller, supra,* at 473, 82 S.Ct. at 491. Yet the plaintiffs, who have urged that *Poller* prevents a grant of summary judgment here, have not asked for a jury trial. The same theories which would be presented to the Court at a non-jury trial are now before the Court in the context of the motion for summary judgment. Although credibility of witnesses would be an issue for determination only at trial, this does not affect the essential theory of plaintiffs' case. There are few credibility questions presented at all by the evidence and none that is material.

An antitrust case, like any case, is subject to analysis under F.R.C.P. 56 and summary judgment is appropriate if there are no material facts in dispute.[9] Here, a study of the statement of material facts submitted by the defendants pursuant to Rule 401.4 of the Local Rules, and of the plaintiffs' corresponding statement, reveals that there are no real disputes as to the nature of the practices and policies of Blue Shield to which the Dental Associations object. The areas of contention are the effects of those practices and policies, the motivation behind them, and the proper conduct of an analysis of the relevant market.

Naturally, the threshold inquiry in any of PDA's Section 1 claims of vertical price fixing, boycott, and horizontal price fixing is whether Blue Shield has acted in concert with participating dentists to engage in these practices. This inquiry can best be addressed by examining PDA's claim that Blue Shield has engaged in horizontal price fixing.[10]

After extensive study of this case, it becomes clear that PDA's claim against Blue Shield really depends upon PDA's ability to prove its assertion that Blue Shield "is a mere instrumentality through which certain dentists and Donald S. Mayes, D.D.S. have conspired and do conspire in violation of the Sherman Act" and "is actually a mechanism through which a conspiracy or conspiracies of participating dentists is or are effected." Brief for plaintiffs, page 2. The initial and greatest hurdle in finding that the plaintiffs have established, for summary judgment purposes, a cognizable antitrust claim, is that they have failed to clarify whether these dentists have conspired to raise dental service prices, lower them, stabilize them, or affect them in some other way. If the conspiracy is to raise prices, PDA's grievance is not economic in nature, since there is no barrier preventing any dentist from becoming a participating dentist.[11] PDA has not explained the nature of its grievance.

■ A price restraint established by an agreement among competitors in a service market, which tends to provide the same economic rewards to all practitioners regardless of their skill, experience, training, or willingness to employ innovative and difficult procedures in individual cases, violates the Sherman Act, even when the restraint is a maximum price and the competitors are physicians. *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). There, a

---

**9.** "... [A]ntitrust litigation, if made immune from summary judgment, could become an anticompetitive activity itself ... we should use summary dispositions to dispose of antitrust complaints that lack any significant supporting evidence." *Klamath-Lake Pharmaceutical Assn. v. Klamath Medical Service,* 701 F.2d 1276 at 1281–1282 (9th Cir.1983).

**10.** Although not clearly expressed in the third amended third party complaint, the contention is that Blue Shield, as a "mere instrumentality" of certain dentists, has acted to maintain the price of dental care "at artificial rates." Pre-tri-

al order of third party plaintiffs at 38. We construe this, as does Blue Shield, as a claim of horizontal price fixing, pursuant to *Arizona v. Maricopa County Medical Society, infra.*

**11.** The fact that less than 9% of the dental care in Pennsylvania is purchased by Blue Shield on behalf of its subscribers looms large. The plaintiffs have made no showing or argument that the 91% of dental care for which there is not Blue Shield coverage will not seek out the lowest price for that dental care.

group of doctors agreed together upon maximum prices to charge for various medical services. Those doctors who participated in the plan agreed to accept no more than the maximum fee from patients who were insured under the doctors' plan. The Court held the plan to constitute a *per se* violation of the Sherman Act because it was a price-fixing scheme.

■ There are two principal differences between the facts of the present case and those in the *Maricopa County* case: (1) Here, there is no setting of a maximum fee, minimum fee or any fee at all. Both participating and non-participating dentists are free to independently arrive at and charge their own fee. (2) Here, there is no participation by the dentists in the setting of a maximum or minimum fee, first because there is no set fee and secondly because the UCR mechanism is established by Blue Shield which is not, like the Maricopa County Medical Society, an organization composed of practitioners.

The plaintiffs maintain that these differences are illusory. PDA claims that Blue Shield is in actuality an organization of providers or, in PDA's words, "a mechanism through which a conspiracy or conspiracies of participating providers is or are effected." PDA's argument in this regard is contradicted by the actual corporate and operational structure of Blue Shield and by the fallacies of the argument itself.[12] The fact that Blue Shield's thirty-two member board of directors is composed of 50% lay persons and has only two dentists upon it necessarily distinguishes Blue Shield structurally from the Maricopa County Medical Society, which was composed entirely of participating providers. Only one-sixteenth of the persons responsible for making the decisions which PDA claims to be potentially and in fact anti-competitive are themselves competitors in the relevant market. The other fifteen-sixteenths of the board's members are themselves consumers of dental services whose natural interest would be in the success of Blue Shield as a health services insurer and who have not been shown to have any interest in the profitability of dentists' practices. To the extent that the plaintiffs contend, therefore, that the participating dentists and Blue Shield conspire to fix a higher price than the competitive market price, their assertion is not logical and is controverted by Blue Shield's structure. At the same time, it makes no sense to assert that the participating dentists conspire to fix prices that are lower than the competitive market prices. The inevitable conclusion, clearly supported by the material facts presented by this case, is that the dentists do not have control of Blue Shield.[13]

Plaintiffs also claim that the UCR mechanism does in effect set a fee, since a component part of the UCR mechanism is the state-wide "customary" fee for a particular dental service. However, the plaintiffs have presented no evidence that the "customary" element of Blue Shield's reimbursement formula has had any effect upon the fees charged either by participating or non-participating dentists in Pennsylvania. At most, they claim and could show that "UCR performance in Market II has approximated the ninety percent level each year since 1975." Brief for plaintiffs, page

---

**12.** It is important to note, since this is a motion for summary judgment, that it is not testimonial evidence that PDA relies upon to establish and advance its "conspiracy mechanism" argument. PDA does not point to conspiratorial conversations, the testimony of Blue Shield insiders or participating dentists to establish its conspiracy theory. To the extent that its theory is at all factually supported, it is on the basis of circumstantial evidence: the Blue Shield Board "rubber stamps" its committees' recommendations and the dental committees are composed of a majority of participating dentists.

**13.** Our attention has been directed by PDA in a supplemental brief, to the case of *St. Bernard General Hosp. v. Hosp. Service Ass'n of New Orleans, Inc.,* 712 F.2d 978 (5th Cir.1983), as illustrative of "effective" provider control and of other points. We believe, like *Maricopa, St. Bernard* is factually distinguishable from the case at bar since, in *St. Bernard,* each of the nine participating hospitals appointed two representatives to Blue Shield's thirty-one member board, the remaining thirteen members being elected by the eighteen members previously appointed.

16. By this, they seem to mean that the rate of reimbursement by Blue Shield for particular services to Blue Shield subscribers is, in the aggregate, approximately ninety percent of the aggregate usual charges of all reimbursed dentists for those services. That result is not the same as a maximum fee. The UCR reimbursement mechanism does not "serve to provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases." Crediting PDA's theory fully, at most it can be said that a participating doctor, when treating a Blue Shield subscriber, may not realize the full benefit and value of his skill, experience, training and innovation to the extent that his fee exceeds the ninetieth percentile of statewide customary fees. This is necessarily a very limited impact upon price competition, applying as it does to only nine percent of the dental services performed statewide. As a matter of mathematical logic, it applies only to a very small percentage of those services, since only the charges of those dentists at the very upper end of the range of fees are so affected. In any event, the impact does not result from an agreement among providers, but rather from an agreement between the individual provider and Blue Shield.

Therefore, the decision in the *Maricopa County* case does not warrant a conclusion that there is an illegal price-fixing scheme in this case. Further, as Blue Shield has observed in its brief, this case is not factually similar to *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 624 F.2d 476 (4th Cir.1980), where the practice of Blue Shield of Virginia was to reimburse services rendered by clinical psychologists only when those services were billed through a physician. There, the concentration of physicians (a majority)[14] on the Board of Blue Shield of Virginia, *when viewed in relationship to the practice in question*, led the Court to find the exist-

ence of an illegal horizontal arrangement. Here, the plaintiffs provided the Court with no such logical relationship between the structure of Blue Shield and any particular alleged anticompetitive results upon which to infer an antitrust violation. The plaintiffs generally claim to be aggrieved and aver that foul play is afoot, but they have failed to present facts and a cogent theory which demonstrate these claims. We conclude that this case is not governed by the *Maricopa County* case and that there is not a *per se* horizontal price-fixing violation.

■ Although we believe that the failure of proof of concerted action runs through PDA's other Section 1 claims, as well as the horizontal price fixing claim just discussed, we will examine each of these claims further. Provider agreements, such as those which exist between Blue Shield and participating dentists, have been scrutinized under the antitrust laws in a large number of cases. In *Group Life & Health Insurance Co. v. Royal Drug*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), the Supreme Court established a perspective of such agreements which is important in several respects to this case. The Court held that such agreements are not within the "business of insurance" exception to the Sherman Act and characterized them as "arrangements for the purchase of goods and services by [the insurer]." 440 U.S. at 214, 99 S.Ct. at 1074. In a number of other cases, courts have held such provider agreements to be lawful under federal antitrust law, and have done so in the context of motions for summary judgment. Many of these cases have involved facts very similar or analogous to those presented here. *See, Sausalito Pharmacy, Inc. v. Blue Shield of California*, 544 F.Supp. 230 (N.D.Cal.1981), *aff'd.*, 677 F.2d 47 (4th Cir.), *cert. den.,* — U.S. ——, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982); *Quality Auto Body v. Allstate Insurance Co.*, 1980–2 Trade Cases ¶ 63,507 (N.D.Ill.1980), *aff'd.*, 660

---

**14.** Psychiatrists, who stood to gain by the practice, are physicians. Clinical psychologists are

not.

F.2d 1195 (7th Cir.1981), *cert. den.*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982); *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Conn.*, 518 F.Supp. 1100 (D.Conn.1981), *aff'd.*, 675 F.2d 502 (2nd Cir.1982); *Human Resource Institute of Norfolk, Inc. v. Blue Cross of Virginia*, 498 F.Supp. 63 (E.D.Va. 1980); *Blue Cross and Blue Shield of Mich. v. Michigan Association of Psychotherapy Clinics*, 1980–2 Trade Cases ¶ 63,-351 (E.D.Mich.1980); *Davidowitz v. San Diego County Dental Society*, 1983–1 Trade Cases ¶ 65,231 (S.D.Cal.1983). The view mandated by *Royal Drug*, that Blue Shield is the purchaser of dental services from the providers, is significant. Under the Sherman Act, "[t]he price fixing within the scope of the *per se* prohibition of section 1 is an agreement to fix prices to be charged in transactions with third parties, not between the contracting parties themselves." *Sitkin Smelting & Refining Co. v. F.M.C.*, 575 F.2d 440 (3d Cir.1978).[15] There is not, in the facts presented here, any evidence of any agreement to fix prices to be charged to third parties. To the extent that Blue Shield purchases dental services on behalf of groups of subscribers, there is no evidence of any agreements between Blue Shield and providers as to Blue Shield's resale prices; i.e., Blue Shield's charges to subscribers for dental coverage.

In the absence of an agreement to fix prices to third parties and therefore of a *per se* vertical price-fixing violation, it must be considered whether the provider agreements and other practices of Blue Shield are *intended* to fix the prices of dental services for all dental service consumers, or are intended to affect quantity or quality of dental services, see, *Sitkin, supra; Royal Drug, supra;* or whether there is an anticompetitive effect of the agreements and practices. This analysis must be governed by the rule of reason.

Blue Shield asserts that its UCR program is not intended to and does not in fact set prices for dental services or otherwise restrain trade, in large part because the UCR reimbursement is based upon the fee actually charged by the dentist and because each dentist is free in any event to choose not to participate. PDA's argument that the UCR program does operate to set prices for dental services is not so simply stated. It contends that in the market in which dentists sell and either individuals or third-party payors buy dental services, Blue Shield is engaged in an effort to accumulate participating dentists by causing the fees of non-participating dentists to be greater than those of participating dentists for the same services. In turn, it contends, the prices charged by participating dentists are standardized or fixed by Blue Shield by the "customary" element of the UCR system, pursuant to which reimbursements for particular charges will not exceed the customary charge for that service. Further, PDA contends, dentists are coerced by various practices of Blue Shield to become and remain participating dentists even though the reimbursement for dental services is lower than the dentists' usual fees.

PDA principally appears to contend that Blue Shield's allegedly anticompetitive practices cause Blue Shield's reimbursements to undercut the ordinary charges of PDA's member dentists, and that Blue Shield is attempting "to suppress the price of services purchased by it in Market II[16] as well as the supply of such services." (Brief for plaintiff, page 24). However, it also repeatedly and inconsistently asserts that Blue Shield has caused an artificial increase in the price of dental services by advising participating dentists to raise prices charged to Blue Shield to counteract the effect of the inherent discount resulting from the application of Blue Shield's UCR system. If it is true that Blue Shield advises participating dentists to raise

---

**15.** The contentions by the plaintiffs that there is a *per se* illegal *horizontal* price-fixing scheme is considered, *infra*, pp. 467–469 under the relevant case decisions.

**16.** PDA's "Market II" is defined by it as the market in which "individual dental firms sell bulk dental services to be provided directly to patients/subscribers at no cost to the latter."

prices to "beat" the UCR system, the only conceivable artificial or wrongful inflation of prices for dental services would be felt by the uninsured patients of participating dentists. PDA has advanced no reason, and none is imaginable, why these patients would not switch to other (presumably non-participating) dentists whose prices are not artificially inflated. Therefore, PDA has not demonstrated, in opposing the summary judgment motion, that Blue Shield's practices intentionally cause non-participating dentists to become participating dentists through the elevation of non-participating dentists' prices. Moreover, the case decisions have consistently held that provider agreements that require a participating provider to accept the UCR reimbursement rate as full reimbursement do not violate the antitrust laws. *Michigan State Podiatry Ass'n. v. Blue Cross and Blue Shield of Michigan*, 1982–2 Trade Cases ¶ 64,801 (E.D.Mich.1982) *Blue Cross and Blue Shield of Michigan v. Michigan Ass'n. of Psychotherapy Clinics*, 1980–2 Trade Cases ¶ 63,351 (E.D.Mich.1980); *Sausalito Pharmacy, supra; Davidowitz, supra; Michigan Ass'n of Psychotherapy Clinics v. Blue Cross and Blue Shield of Michigan*, 1982–83 Trade Cases ¶ 65,635 (Mich.Ct.App.1982). "The failure to make more money, however, is simply not the kind of problem which the antitrust laws address." *Sausalito Pharmacy, supra*, 544 F.Supp. at 235. "The antitrust laws ... protect competition, not competitors;

and stiff competition is encouraged, not condemned." *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania*, 481 F.2d 80, 84 (3d Cir.), *cert. den.*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). There is no significant difference presented in this case to warrant another result. PDA has not presented evidence which demonstrates that Blue Shield's practices restrain trade or eliminate competition in the market in which dentists sell, and individuals and insurers buy, dental services.

■ PDA's argument that Blue Shield also restrains trade by boycotting non-participating dentists and coercing or attempting to coerce dentists to become participating dentists by various practices is unconvincing. PDA contends that this occurs in part by reason of Blue Shield's refusal to make payment directly to non-participating dentists for services to Blue Shield subscribers, and by its refusal to notify these dentists that subscribers have been paid. Further, PDA alleges that Blue Shield publishes brochures "implying that non-participating dentists charge too much,"[17] publishes lists of participating dentists, and permits only participating dentists to become "excepted"[18] dentists.

Blue Shield's practice of not making payment directly to a non-participating dentist means simply that the non-participating dentist's payment relationship with his patient, who is a Blue Shield subscriber, is

---

17. The instances in PDA's brief in which it states conclusory facts rather than particular facts, with extremely general citation to supporting proof or no reference at all, are legion.

18. An "excepted" dentist is a dentist who is not routinely required by Blue Shield to submit diagnostic aides for Blue Shield's review in connection with claims for reimbursement for dental services. In 1979, Blue Shield began a practice of granting excepted dentist status only to participating dentists. It should be noted that the various practices of which complaint is made have been found acceptable by other courts. *See, e.g., Ratino v. Medical Service of District of Columbia*, 1981–1 Trade Cases, ¶ 64,-144 (D.Md.1981), (direct payment to patients of non-participating doctors only and informing subscribers of participating doctors' lower fees not a boycott); *Frankford Hospital v. Blue Cross*

*of Greater Philadelphia*, 417 F.Supp. 1104 (E.D. Pa.1976) (publication of lists of participating doctors not a boycott); *Quality Auto Body v. Allstate Insurance Co.*, 1980–2 Trade Cases, ¶ 63,507 (N.D.Ill.1980), *aff'd.*, 660 F.2d 1195 (7th Cir.1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982) (analog to excepted dentist classification considered reasonable business practice). We have been advised that *Ratino, supra* was reversed by the Fourth Circuit Court of Appeals on September 28, 1983. *See, Ratino v. M.S.D.C.*, 1983–2 Trade Cases ¶ 65,641. Although the reversal was based on grounds inapplicable here, the court in dicta did comment on the price fixing and other claims. Based on the thorough record before us, and the fact that this is a non-jury trial, we believe we have satisfied the analysis suggested in dicta by the court.

the same as his relationship with all of his other patients; that is, the dentist expects and presumably receives payment from the patient. PDA has not suggested what purpose notification to the non-participating dentist of the patient's receipt of a Blue Shield reimbursement check would serve. If it implies that dentists have collection problems, it lends support to Blue Shield's argument that to the extent that the Blue Shield UCR formula discounts some dentists' usual fees, it provides a corresponding benefit, certainty of collection. In any event, Blue Shield's practice is reasonable and pro-competitive. "Antitrust law does not condemn effective merchandising." *Human Resource Institute of Norfolk v. Blue Cross of Virginia*, 498 F.Supp. 63, at 67 (E.D.Va.1980), citing *Travelers Insurance Co., supra.* The Court finds no evidence to support a boycott claim under Section 1 of the Sherman Act. Defendants are entitled to summary judgment as to this claim.

 We turn to Counts II and III of the third-party complaint. Under Section 2 of the Sherman Act, which forms the basis for these counts of the plaintiffs' complaint, the plaintiffs would be required to establish at trial that Blue Shield possesses monopoly power in a particular market and that such power was willfully acquired or maintained, as distinguished from having developed as a result of a superior product, business acumen or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966). To establish attempted monopolization under Section 2, plaintiffs' would need to prove a specific intent on Blue Shield's part to monopolize and a dangerous probability of success within a relevant product and geographic market. *United States v. Empire Gas Corp.*, 537 F.2d 296 (8th Cir.1976), *cert. den.*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). Both offenses necessarily involve proof of a relevant market consisting of those products or services which compete with each other in the sense that they are reasonably interchangeable by consumers for the same purpose.

██ The plaintiffs' theory of monopolization and attempted monopolization on the part of the defendants focuses largely upon the market for the sale of prepaid dental services. As such, it is questionable whether the plaintiffs have standing to bring these Section 2 claims since it is other actual or putative sellers of prepaid dental services who would be harmed by the alleged monopolization. *See,* 15 U.S.C. § 15. However, the plaintiffs contend that they are harmed, and defendants do not directly challenge plaintiffs' standing.

In attempting to establish their claim under Section 2 of the Sherman Act, the plaintiffs rely heavily upon the affidavit of William S. Comanor, Ph.D., appended to their brief as Exhibit B. The Comanor affidavit contains a series of conclusions concerning the existence of various markets, and the role played by Blue Shield and other entities and individuals in those markets. For purposes of the pending motion, Dr. Comanor's qualifications and competence to state the opinions contained in his affidavit will be assumed. The facts upon which he bases his opinion, however, may not be assumed to exist. Rule 56 of the Federal Rules of Civil Procedure requires a non-moving party to establish the existence of material facts by affidavit or otherwise. To the extent that the opinions stated by Dr. Comanor are based upon facts not established in a manner provided for under Rule 56, said opinions may not be treated as establishing a material factual dispute where one would not otherwise exist.

Dr. Comanor describes two principal markets in which he considers Blue Shield to operate. Market I is the market for the sale of prepaid dental care and of dental insurance. He views prepaid dental care to be so different from dental insurance, however, that he concludes that there are two relevant sub-markets within Market I, one for the sale of prepaid dental care and one for the sale of all other forms of dental insurance. The other market that he describes, Market II, is the market for the

purchase of dental services. Here, again, he finds two sub-markets, one being the market for the purchase of dental care by an individual and the other being the market for the purchase of "bulk" dental care by prepaid dental care programs, the only two of which in Pennsylvania are Blue Shield and Delta Dental.[19]

The finding that there are two separate markets in which dental services are bought and sold, coupled with the fact that Blue Shield and Delta Dental are the only two "buyers" of prepaid dental services, with Blue Shield being by far the larger of the two, permits Dr. Comanor to conclude that Blue Shield buys approximately ninety-one percent of all the commodities (prepaid dental services) sold in a particular market.

Dr. Comanor then concludes that Blue Shield has monopsony power as a buyer of prepaid dental services in Market II, which permits it to pay ten percent less for dental services provided to its subscribers than is paid for dental care provided to other persons. Monopsony power is exercised by a buyer who completely dominates a given market. Dr. Comanor is saying, in other words, that Blue Shield as a buyer in Market IIA pays less for dental care than individuals pay for dental care in Market II. Dr. Comanor does not explain how it is relevant to the existence of a monopoly that a buyer in one market pays less for a commodity than a buyer in another market pays for a different commodity.

The ultimate conclusion stated by Dr. Comanor is that "(1) Blue Shield's market share of about forty percent on the selling side of Market I understates its market power because of the high product differentiation which exists; (2) that Blue Shield has substantial monopsony power in Market II; and (3) it has exercised this power to the economic detriment of Pennsylvania dentists."

Defendants argue, in support of their motion for summary judgment as to

Counts II and III of the complaint, that the plaintiffs have not adduced evidence which would permit us to define the relevant product market at issue more narrowly than the provision of prepaid dental care in Pennsylvania through all third-party payers. The Court is satisfied that this assertion is correct.

The Comanor affidavit refers to many factual assumptions for which plaintiffs have cited no support in the record: "In the approximately 13 years that prepaid dental care and dental insurance have existed in Pennsylvania, it has become apparent that the commercial insurers are unwilling to supply programs which involve direct provider contact." (No basis for these statements and conclusions is cited.) "Moreover, while Blue Shield offers a dental indemnity program (Penndental V), this product appears to have been relatively unsuccessful in Market I." (The plaintiffs have cited no evidence to permit the characterization of an objective on the part of Penndental V to compete in plaintiffs' Market I and a lack of success in that objective.) "On this basis, there appear to be factors which limit in Market I the degree of substitutability in production between prepaid service benefit dental programs and dental insurance or indemnity programs." (The language, "on this basis, there appear to be factors ..." is an inadequate foundation for the conclusion which follows.) "... [V]arious large employers, as well as governmental bodies and unions themselves, desire only prepaid service benefit dental programs." (No factual basis for this statement is cited.) "For these groups, who are on the buying side of Market I, the degree of substitutability in use between prepaid service benefit dental programs and dental indemnity programs may be quite low." (This statement on its face is surmise.) "Fluctuations in price will not cause them to switch from a prepaid service benefit dental program to a dental indemnity program to the extent that they

---

**19.** Dr. Comanor views Blue Shield as a purchaser of dental services. He does not choose to view an insurance company as a purchaser of

services because it pays for dental services at a set rate rather than on a UCR basis.

are committed, whether because of union pressures or some other reason, to provide fully prepaid dental care." (There is no factual basis cited for this statement. Further, it is a conditional statement and can not on its face support the conclusion that follows.) "For other purchasers, however, the degree of substitutability in use between prepaid service benefit dental programs and dental indemnity programs may be relatively high." (This statement on its face is surmise.) "In conclusion, the cross-elasticities of supply and demand in Market I suggest that it can be viewed as a market with two distinct sub-markets." (Considering the lack of a factual basis for the propositions leading to this conclusion and the tentative nature of this statement, the conclusion is not established for purposes of this motion.)

In establishing the existence of two markets of purchasers of dental services in Pennsylvania, Dr. Comanor views the relevant issue as "whether, in response to any possible price cuts by Blue Shield or Delta Dental, dentists will shift their output from the production of pre-paid dental care to individual dental care." If so, Dr. Comanor says, these two markets would effectively be one, but if not, there are really two separate and distinct markets. Dr. Comanor then concludes that whether "dentists will shift" depends upon whether dentists are at full capacity. If the dentist is not at full capacity, Dr. Comanor says, he is not likely to shift in response to price differences and there are therefore two markets. Dr. Comanor states that, "The fact that substantial excess capacity exists among Pennsylvania dentists suggests the finding of separate markets." The plaintiffs have cited no facts supporting the proposition

that substantial excess capacity exists among Pennsylvania dentists.

In fact, Dr. Comanor seeks to prove that there are two markets by viewing a history of participation by dentists with Blue Shield from 1975 to 1982 and by asserting that the number of participating dentists has generally increased despite the reduction of reimbursement rates by Blue Shield between 1975 and 1982 from ninety-eight percent to ninety percent.[20] He concludes that this finding can be explained by the substantial excess capacity in the production of dental services in Pennsylvania and the dentists' corresponding search for more business despite lower prices. The circular nature of Dr. Comanor's reasoning on this point is self-evident.[21]

Thus, the plaintiffs have alluded to no evidence to support the notion that Blue Shield, commercial insurance carriers and other health service corporations do not compete for the business of purchasers of dental insurance. *See, United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Competition is to be recognized where, in fact, competition exists. *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The evidence cited by Blue Shield in its brief, including the deposition testimony of the chief executive officers of Blue Shield's competitors for dental insurance business, and the affidavits of twelve persons who arrange for purchases of dental insurance plans for Pennsylvania businesses and companies, establishes that from the perspective of purchasers of dental care coverage, Blue Shield and other health service corporations and commercial carriers are in direct competition. PDA presents no conflicting evidence to establish a material fact in dispute.[22] Moreover, Blue Shield's system of

---

**20.** Of course, as already noted, these percentage figures represent averages. Blue Shield's reimbursement system compensates some dentists their full usual charge.

**21.** Besides relying on a fact that has not been shown, excess capacity, Dr. Comanor's concept that dentists will or would "shift" from insured to uninsured patients, or vice-versa, seems illogical, since it is doubtful that dentists would be

in a position to concentrate on one group or the other.

**22.** PDA did file, on June 24, 1983 an affidavit of John G. Milakovic, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. In the affidavit Mr. Milakovic (who is one of PDA's attorneys) testified to his belief that cross-elasticity of supply and demand between prepaid service benefit dental programs and "commercial pre-

participating doctors and direct provider payment is not so obviously unique as to render other forms of dental plans non-competitive with Blue Shield from a potential customer's perspective. We conclude that to the extent that this case involves the market for the sale of prepaid dental coverage and an allegation by the plaintiffs of a Blue Shield monopoly in that market, said market is defined to include all prepaid service benefit dental programs and all dental insurance or indemnity programs.

■ Because Blue Shield's share of the market for the sale of dental coverage to consumers thereof in Pennsylvania is no greater than forty percent, it does not appear that a monopoly exists. *See, United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir.1945); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264 (9th Cir.1975); *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, at 974 (8th Cir.1968), *cert. den.*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969).[23] Furthermore, plaintiffs have not pointed to any real evidence which demonstrates that Blue Shield's forty percent market share permits it to have any control over the price of dental insurance or permits it to exclude competitors from the market, but instead have relied upon the highly speculative af-

fidavit of Dr. Comanor, which itself is not based upon facts of record.

Blue Shield's market share is not sufficiently large to create a dangerous probability that it can succeed in monopolizing the market for dental insurance or prepaid dental care. *See, United States v. Empire Gas Corp.*, 537 F.2d 296 (8th Cir.1976), *cert. den.*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Nifty Foods Corp., v. Great Atlantic & Pacific Tea Co., Inc.*, 614 F.2d 832, 841 (2d Cir.1980); *Diamond International Corp. v. Walterhoefer*, 289 F.Supp. 550, 578 (D.Md.1968); *Hoffman v. Delta Dental Plan of Minn.*, 517 F.Supp. 564, 573 (D.Minn.1981). Additionally, PDA has pointed to no evidence of acts, methods or plans devised or employed by Blue Shield to monopolize the market. It has not therefore pointed to evidence of a specific intent to monopolize on Blue Shield's part.

The plaintiffs seek to have us deny summary judgment and to permit the case to go to trial on the basis of a theory that is, at best, inherently inconsistent and incapable of clear, legal definition. In essence, they seek the opportunity to utilize the trial forum to pursue their case in search of its existence. A generous period of time has already been accorded plaintiffs for dis-

paid indemnity programs" was very low. To support these contentions, Mr. Milakovic offered to depose various witnesses whom he had been "unable to contact." Mr. Milakovic estimated that three weeks would be required to complete this process. We believe the affidavit should have been accompanied by a motion, to give Blue Shield an opportunity to respond (*See* Rule 7 of the Federal Rules of Civil Procedure). Further, we do not believe the extension sought is justified. Ample time was allowed for discovery, and the discovery period has expired long ago. We find PDA's inability to support this most fundamental aspect of its case, if only by affidavits, both inexplicable and unacceptable. In a related matter, PDA has moved to strike the affidavits submitted by Blue Shield to establish cross elasticity. Blue Shield has filed a motion to strike the motion and for counsel fees. Although the affidavits contain some conclusory and inadmissible statements, they also contain useful and relevant information which we will consider. We will not strike the affidavits or selected portions of them but will instead consider them for what they are worth. The

court is familiar with the rules of evidence. PDA's motion to strike will be denied as will Blue Shield's motions to strike and for counsel fees.

23. The defendants have not pursued the proposition that self-insurance should be factored into the calculation of the percentage of the sales in the relevant market made by Blue Shield. However, considering the dynamics of collective bargaining and other factors which determine whether groups of persons will have dental insurance at all or may opt for higher wages or some other benefit instead, self-insurance may be a viable competitor of Blue Shield. From the perspective of the individual purchaser of a Blue Shield plan, moreover, a resort to self-insurance may readily be chosen as an alternative to prepaid coverage if the price of prepaid coverage becomes relatively high. If self-insurance is considered, then Blue Shield's market share in the relevant market is probably 9%, the percentage of dental services that are covered by Blue Shield insurance.

covery in this case, and substantial discovery was pursued.[24] The inability of the plaintiffs at this juncture to set forth in direct and concrete terms the nature of their claims and the proof which supports them persuades us that further judicial resources should not be devoted to the plaintiffs' theories, and that this case is particularly appropriate for summary judgment.

The plaintiffs also have asserted that summary judgment should be refused because there are facts in dispute as to Blue Shield's motive and intent in establishing and pursuing the various practices to which the plaintiffs object. The absence of a clear and cogent theory of the nature of Blue Shield's antitrust infraction(s) defeats this assertion. The plaintiffs have failed to state clearly even the nature of the wrongful motive and intent that they would prove, and they have certainly failed to demonstrate that they have proof to support their conclusory allegations that Blue Shield and some or all participating dentists are conspiring to fix prices and boycott non-participating dentists.

██ There remains for consideration the plaintiffs' claim that Blue Shield's Dental PLUS program constitutes an illegal boycott against non-participating dentists and the plaintiffs' state law claims.

The Dental PLUS program is a dental care program provided by Blue Shield that is available to those employees of United States Steel Corporation who are employed at its Fairless Hills plant, and who elect such coverage. Under Dental PLUS, a dental office which has agreed to participate in the program provides all covered dental services to the subscribers in return for a fixed fee per subscriber per month. This arrangement is variously described as a "capitation" or "health maintenance organization" concept. The employees of the steel plant are free to accept or reject participating in the program, and to date sixteen percent of the employees have elected to participate. The others receive ordinary Blue Shield UCR coverage, already considered herein. Dental PLUS providers must be Blue Shield participating dentists.

Plaintiffs argue that the Dental PLUS program amounts to an illegal boycott of those dentists who do not participate in the program. Defendants in turn reply that there is not an actionable boycott of non-participating dentists since there is no element of coercion present with Dental PLUS and that, in any event, Dental PLUS is immune from the application of the antitrust laws because it constitutes state action. There appear to be no material facts in dispute concerning the Dental PLUS program and the merits of the plaintiffs' claim may therefore be decided under F.R.C.P. 56 as a matter of law. In view of the very limited presence of the Dental PLUS program in Pennsylvania currently, it is not conceivable that it operates in any significant way as a boycott since it affects at most, the economic interests of a small number of Pennsylvania dentists. A more meaningful evaluation of the effects of Dental PLUS could be accomplished if and when the program becomes more widespread. The Court concludes, as did the Ninth Circuit Court of Appeals in *Klamath Lake Pharmaceutical Association v. Klamath Medical Service Bureau*, 701 F.2d 1276 (9th Cir.1983), that the program, at least as it presently exists in Pennsylvania, represents merely the simple exercise by Blue Shield of its freedom of contract. A solitary contract involving sixteen percent

---

**24.** Specifically, by order of October 21, 1981, discovery was ordered completed by February 1, 1982, and trial was listed for February 3, 1982. The third-party complaint was filed on November 17, 1981. On February 1, 1982, at the request of PDA, the discovery deadline was extended to November 15, 1982, and trial was rescheduled to begin December 3, 1982. On August 13, 1982, the court accepted a magistrate's report recommending that the discovery deadline be extended to February 28, 1983, with trial to commence on April 4, 1983. Subsequently, on January 18, 1983, the discovery deadline was extended to April 15, 1983, and the case was moved to the June, 1983 trial list. Although further requests for extension of the discovery deadline have been refused, trial of the case has been continued a number of times, most recently pending disposition of the instant motion.

of the employees of one steel plant cannot reasonably be viewed as a boycott of all other dentists in Pennsylvania such as is prohibited by the antitrust laws. The defendants contend that, in any event, Dental PLUS constitutes state action which is exempt from the federal antitrust laws because capitation reimbursement plans such as Dental PLUS are specifically authorized and encouraged by Pennsylvania law and the Pennsylvania Departments of Health and Insurance. Because the defendants are entitled to summary judgment as to the Dental PLUS program at the Fairless Hills steel plant on the grounds that it does not constitute a boycott on the facts presented here, however, the state action exception issue need not be reached.

 Count IV of the plaintiffs' complaint, which alleges causes of action under state tort principles, will be dismissed. Jurisdiction for these state claims arises solely because they are pendent to the federal antitrust claims. Plaintiffs have made no showing of exceptional circumstances warranting our exercise of pendent jurisdiction. *See, Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc., supra.*[25]

The class action counterclaim against Blue Shield and Dr. Mayes, filed on September 20, 1982, as a part of the reply of PDA and others to the third-party counterclaim of Blue Shield, must be considered in connection with our decision to grant summary judgment in favor of the third-party defendants upon the third-party complaint. The claims made in the class action counterclaim are the same as the claims in the first three counts of the third-party complaint. However, there are parties in the class action counterclaim (the members of the certified class) in addition to those in the third-party complaint. Moreover, Blue Shield and Dr. Mayes have not stated that its present motion for summary judgment is made as to the class action counterclaim as well as to the third-party complaint. It

would, however, serve no valid purpose for the Court to act upon the motion for summary judgment with respect only to the third-party complaint and not with respect to the class action counterclaim when precisely the same issues are involved in both. Summary judgment therefore will be granted in favor of Blue Shield and Dr. Mayes upon both the third-party complaint and the class action counterclaim.

IT WILL BE SO ORDERED.

---

**25.** Although Blue Shield filed a motion for summary judgment on these claims, the motion was not timely since it was filed on the day of oral argument on the pending summary judgment motion.