PENNSYLVANIA DENTAL
ASSOCIATION, et al.,
Third-Party Plaintiffs,

v.

MEDICAL SERVICE ASSOCIATION
OF PENNSYLVANIA, et al.,
Third-Party Defendants.

Civ. A. No. 81–1187.

United States District Court,
M.D. Pennsylvania.

April 17, 1986.

John C. Sullivan, Nauman, Smith, Shissler & Hall, Harrisburg, Pa., for Bruce Cutler.

Charles F. Scarlata, Scarlata & DeRiso, Pittsburgh, Pa., for Theodore R. Paladino, D.D.S.

Thomas A. Beckley, John G. Milakovic, Beckley & Madden, Harrisburg, Pa., for Pa. Dental Ass'n and Donald Mayes; Barry E. Carter, Washington, D.C., of counsel.

Thomas E. Wood, Keefer, Wood, Allen & Rahal, Harrisburg, Pa., Michael Hennessy, Edward L. Springer, Joseph Friedman, Springer & Perry, Pittsburgh, Pa., for Med. Serv. Ass'n/Blue Shield.

MEMORANDUM

CALDWELL, District Judge.

Before the Court and ripe for decision is the motion of the third-party counterclaim defendants [1] (referred to hereinafter as "the dentists") for summary judgment with respect to the third-party counterclaim of the third-party plaintiffs [2] (referred to hereinafter as "Blue Shield"). This Opinion addresses that motion.

The Commonwealth of Pennsylvania initiated this civil action on October 20, 1981, by filing a complaint against the Pennsylvania Dental Association (PDA) and a number of other dental associations, contending that these associations were violating antitrust laws, principally by encouraging dentists to terminate Blue Shield participating dentist agreements. The Association filed answers to the complaint on or about November 9, 1981.

On November 17, 1981, the PDA filed the third-party complaint at issue here naming, *inter alia*, Pennsylvania Blue Shield and Donald S. Mayes, D.D.S. as third-party defendants.

On March 11, 1982, after a motion to dismiss had been denied, Blue Shield filed its answer to the third-party complaint and its counterclaim against the dentists. The dentists moved to dismiss Blue Shield's counterclaim, which motion was denied by order of July 30, 1982. On September 20, 1982, the dentists filed a responsive pleading to Blue Shield's counterclaim, which included a class action counterclaim against Blue Shield and Dr. Mayes brought by PDA and three other dental associations.

On September 15, 1982, Blue Shield filed a motion for a preliminary injunction. On November 17, 1982, PDA filed a motion for a preliminary injunction. On December 30, 1982, both the motions of Blue Shield and of PDA for preliminary injunctions were denied.

On November 22, 1982, the Court granted a joint motion of the Commonwealth and the Dental Associations dismissing the initial complaint on the basis of a settlement agreement.

On January 25, 1983, the class plaintiffs filed a motion for class certification. On April 6, 1983, that motion was denied in part and granted in part, the Court denying class certification completely to one subclass and certifying another subclass for injunctive relief only. That order was appealed to the Third Circuit Court of Appeals on April 13, 1983. On April 26, 1983, Blue Shield and Dr. Mayes filed a motion to dismiss the appeal and on May 24, 1983, the appeal was dismissed.

On October 28, 1983, the Court addressed the dentists' third-party complaint and class action counterclaim against Blue Shield in this case, deciding that Blue Shield was entitled to summary judgment as to those claims. *Pa. Dental Ass'n. v. Med. Serv. Ass'n. of Pa.*, 574 F.Supp. 457 (M.D.Pa.1983), *aff'd.*, 745 F.2d 248 (3d Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). We now address the dentists' motion for summary judgment as to Blue Shield's claims that the dentists and their associations have violated the antitrust laws.

In the third-party counterclaim, Blue Shield claims that the dentists have unlawfully restrained trade in violation of Section 1 of the Sherman Act by unlawfully combining and conspiring to boycott Blue Shield's dental health care plans, so as to discourage organizations from enrolling in Blue Shield's health care plans to stabilize fees for dental services, to interfere with Blue Shield's cost containment efforts and

---

**1.** The third-party counterclaim defendants are the Pennsylvania Dental Association, the Delaware Valley Dental Society, the Erie County Dental Association, Inc., the Harrisburg Area Dental Society, the Luzerne County Dental Society, the Montgomery-Bucks County Dental Society, the Odontological Society of Western Pennsylvania, the Scranton Dental Society, the York County Dental Society, the Fifth District Dental Society of the Pennsylvania Dental Association, Dennis W. King, D.D.S., Charles M. Ludwig, D.D.S., Theodore R. Paladino, D.D.S., Thomas L. Perkins, D.M.D., Kay F. Thompson.

**2.** The third-party counterclaim plaintiff is Pennsylvania Blue Shield.

to influence Blue Shield policies. The complaint alleges that the dentists and their associations caused other dentists to cease being Blue Shield participating dentists, have agreed to raise, fix and stabilize prices, have communicated guidelines for dealing with Blue Shield, have encouraged dentists not to cooperate with Blue Shield audits, have encouraged dentists to increase fees for patients who have dental insurance and have attempted to coerce Blue Shield to change various provisions of its dental health care plans. Pendent state law claims are also raised by Blue Shield.

Extensive discovery has been completed and extensive documentation is submitted to the Court in connection with the dentists' motion for summary judgment.

The dentists have based their summary judgment motion upon the contention that there is no evidence of actionable antitrust injury. By Order of February 7, 1986, we ordered the parties to file supplemental briefs addressing as well the broader question whether the third-party counterclaim defendants' conduct violated the antitrust laws. We have now carefully considered all of the parties' evidence and arguments. We find that there are no material facts in dispute and that, crediting Blue Shield's viewpoint as to the inferences that can be drawn from all of the evidence to the extent that those inferences are reasonable, the dentists are entitled to summary judgment for the reasons which follow.

## I. FACTS.

In Blue Shield's brief in opposition to the dentists' motion for summary judgment, Blue Shield has set forth a very lengthy statement of the facts which it believes that it could prove at a trial of this case and which it contends would entitle it to relief under the antitrust laws.[3] Blue Shield Brief, November 27, 1985, Doc. 972, pp. 6–74. These facts may fairly be stated in a less lengthy fashion as follows:

The Medical Service Association of Pennsylvania does business under the registered fictitious name of Pennsylvania Blue Shield. Blue Shield is a non-profit corporation operating as a professional health service corporation under the laws of Pennsylvania providing for prepaid medical, osteopathic, psychological, optometric, podiatric, dental services, and certain other professional health services. Blue Shield was created in the late 1930s by representatives of the Pennsylvania Medical Society. The Pennsylvania Insurance and Health Departments regulate Blue Shield pursuant to the Professional Health Service Corporation Act, 40 Pa.C.S. § 6301 *et seq.*, as amended (the Blue Shield Regulatory Act).

Initially Blue Shield programs were structured as fee schedule programs. Blue Shield provided benefits (called service benefits) to its subscribers through a participating doctor system whereby the vast majority of licensed doctors of various health-related disciplines agreed, *inter alia*, to be paid directly by Blue Shield in accordance with certain specified fee schedules for specified services. Doctors in Pennsylvania could participate with Blue Shield by signing a Participating Doctor's Agreement, whereby the doctors agreed to be bound, *inter alia*, by the Blue Shield Regulations for Participating Doctors. Subscribers were always free to use the services of non-participating doctors; however, in that case Blue Shield reimbursed the subscriber and not the doctor. Blue Shield programs were marketed only after approval by the Insurance Department in accordance with the Blue Shield Regulatory Act.

In accordance with the Blue Shield Regulatory Act and Blue Shield's By-Laws as determined by its corporate membership, if a subscriber was classified as under-income, participating doctors were required to accept Blue Shield's payment under the fee schedule for a covered service as payment in full. Also in accordance with the

---

**3.** Blue Shield, specifically "reserves ... its right to set forth ... additional portions of its case ..." (Doc. 972, p. 6). We are satisfied that Blue Shield has set forth a comprehensive statement of its probative evidence, however.

Blue Shield Regulatory Act, if a subscriber was classified as over-income, (also pursuant to Blue Shield's By-Laws and as determined by its corporate membership) the participating doctor was permitted to charge (balance bill) that over-income subscriber an amount in addition to the fee schedule amount paid by Blue Shield.

Under Blue Shield medical/surgical coverage, there was very limited coverage for dental services. The only dental services covered were oral surgical services (e.g. accident/trauma cases, impacted wisdom teeth extractions). An important segment of Blue Shield's business historically was group accounts, usually through employers, labor unions and/or government organizations. In the 1960s these groups began to demand a medical/surgical reimbursement system which could respond to the pressures of inflation yet maintain some reasonable controls over excessive professional charges. This led to Blue Shield's development of a concept of reimbursement of participating dentists by Blue Shield according to a formula which takes account of independently established charges or fees of competing practitioners with a cap at a percentile of usual charges of all practitioners in a similar geographic area and in a similar specialty. This mode of reimbursement is referred to as the UCR, denoting a reimbursement formula which Blue Shield has devised to result in a reimbursement to dentists that is usual, customary and reasonable. Generally, no distinction has been made between over-income or under-income subscribers in Blue Shield's UCR programs, although Pennsylvania law would have permitted such a distinction.

By the late 1960s, after obtaining Insurance Department approvals, Blue Shield widely marketed its medical/surgical UCR product together with Blue Cross hospitalization and Blue Cross/Blue Shield major medical coverage. Under Blue Shield's UCR programs, if a Blue Shield subscriber used the services of a participating physician, the physician by his Participating Doctor's Agreement (as implemented by Blue Shield's Regulations for Participating Doc-

tors) was not contractually permitted to balance bill, i.e. charge the subscriber the difference, if any, between the Blue Shield allowance for a covered service and the physician's charge. In addition, as authorized by the Blue Shield Regulatory Act, subscribers to Blue Shield's UCR programs were not permitted to assign their benefits.

In offering its medical/surgical and other programs, Blue Shield has competed in the marketplace with programs offered by commercial insurance companies. Blue Shield has also been in competition with employers which sponsor self-insured or direct pay programs.

The overwhelming majority of Pennsylvania's physicians are Blue Shield participating doctors. Blue Shield believes that a sufficient number of participating doctors is essential to the operation of effective service benefit programs for Blue Shield subscribers.

Employees in Pennsylvania with group medical/surgical, hospitalization and major medical coverage as employee fringe benefits began seeking other health benefits in negotiations with their employers. The health insurance industry viewed prepaid dental services as the next frontier to explore for employee benefit coverage. Blue Shield determined to meet this marketplace demand in Pennsylvania. In order for Blue Shield to meet these market demands, and be able to offer prepaid dental programs on a service benefit basis, Blue Shield had to rely upon strong participation and cooperation by the individual practitioners who comprised the dental profession.

In 1949, the Blue Shield Regulatory Act was amended to permit dentists to become participating doctors. At that time, the business aspects of the practice of dentistry were quite different than they are today. The average dentist had no one to answer to except the patient. There were no dental utilization review committees and other committees and processes like those with which physicians were confronted in the hospital setting. Dentists were unused to dealing with insurance companies, the

forms and the red tape. Physicians had grown up with the practice since the 1940s.

In the 1960s through the early 1970s, dentistry was still a cottage industry or profession; the profession was one of the last bastions of rugged individualism. Dentists had frequently engaged in sole practice with an office assistant or two and a hygienist. Dentists have placed a great value on the dentist-patient relationship and the traditional private practice, fee-for-service method of delivery of dental services. Traditionally, a direct financial relationship existed between the patient and the dentist. Because there was little or no dental insurance prior to the 1970s, natural market forces tended to influence dentists to charge what patients could afford and to perform only those services patients could afford.

In the late 1960s, the vast majority of Pennsylvania's dentists were members of the Pennsylvania Dental Association (PDA). Counterclaim defendant PDA is the Pennsylvania statewide affiliate of the American Dental Association. It is comprised of ten component districts. Counterclaim defendant Odontological Society of Western Pennsylvania (also known as the Dental Society of Western Pennsylvania) is the Tenth District component of the PDA. Counterclaim defendant Fifth District Dental Society is also a component of the PDA. The ten districts are in turn subdivided into a number of local societies. Counterclaim defendants Harrisburg Area Dental Society and York County Dental Society are local societies within the counterclaim defendant Fifth District Dental Society's geographic territory. Counterclaim defendant Erie County Dental Association, Inc. is a local society within the Ninth District of the PDA. Counterclaim defendants Luzerne County Dental Society and Scranton District Dental Society are local societies within the Third District of the PDA. Counterclaim defendant Montgomery-Bucks Dental Society is a local society within the Second District of the PDA. Counterclaim defendant Delaware Valley Dental Society is not directly affiliated with the PDA. The leadership of the PDA debated upon the role it wished the PDA to play with the advent of dental prepayment. PDA created the Pennsylvania Dental Service Corporation, which does business under the name Delta Dental. Delta Dental was incorporated under the same regulatory act as Blue Shield.

In the late 1960s and the early 1970s, Blue Shield formulated plans for designing and marketing a prepaid dental program. Blue Shield believed that it needed the input of dentists to make its dental program feasible and successful. Blue Shield wanted to market its prepaid dental program on the basis of a participating dentist system. Blue Shield hired a practicing dentist to assist in the design, development and implementation of its prepaid dental program.

Blue Shield, the PDA and Delta Dental consulted with each other and for a time discussed implementing a joint program. This did not materialize and Blue Shield went its separate way. The PDA funded Delta Dental by a loan and Delta Dental has been in competition with Blue Shield ever since.

In 1969, the PDA's House of Delegates adopted a resolution known as H.D. 69–6, which states:

> "[t]hat any not for profit corporation when contemplating a dental program follow the Association's [PDA's] direction and advice in designing and implementing such a program ... that in the absence of such cooperation the Association [PDA] will vigorously inform its members of such lack of cooperation, pointing out to them the intrinsic dangers that are likely to ensue by participating in such programs. The [PDA] will exert all efforts to prevent the approval by the Insurance Department of such service benefit contracts."

That resolution was rescinded in May or June of 1978.

Blue Shield's dental program was designed to be marketed on a group-only basis using the participating dentist, UCR concept. The prototype group dental policy, called PennDental I, was submitted to and approved by the Insurance Department

of Pennsylvania in 1970. In 1970, Blue Shield also submitted its prototype group dental policy to the PDA for its review. In June of 1970, PDA President Dr. Willis McCormick informed Blue Shield that the PDA was satisfied with the proposed design and implementation of Blue Shield's dental plan and saw no reason to file objections with the Insurance Department at that time.

As of June, 1970, Blue Shield perceived everything to be coming up roses. Joint discussions between Blue Shield, the PDA and Delta Dental were still taking place. Blue Shield had not yet sold any groups, but Blue Shield service representatives were signing up participating dentists. Dentists were signing the participating doctor's agreement, agreeing to treat Blue Shield subscribers and to be bound by Blue Shield's regulations for participating doctors. Among the specific matters that dentists agreed to upon participation were (1) to refrain from balance billing, (2) to permit Blue Shield to examine their patient records (audit), and (3) not to charge Blue Shield subscribers more than their usual charges. The Blue Shield prepaid dental program also prohibited assignment of a subscriber's right of payment.

Blue Shield believed that in order to have an effective marketing effort, it should sign up about 70% (or more) of the state's dentists, as participating dentists, which Blue Shield accomplished by mid-1974. Blue Shield sold its first group dental program in January, 1972. Meanwhile, Delta Dental and the commercial insurance companies were also marketing prepayment programs in competition with Blue Shield.

The advent of prepayment coverage changed the way dentists were being paid for their services. Before there was a dentist-patient relationship only. Third-party payment caused some dentists to provide a broad range of services to people who never before had extensive dental services. Some dentists were tempted, because patients had insurance, to charge more, to prescribe a broader range of treatment and to provide more costly services when less expensive services would have sufficed.

Prepaid dental programs are not really insurance. Dental disease is practically universal and the use of services by individuals occurs at a rate in excess of 50% of the individuals in a prepaid dental group per year. The average claim amount is usually less than several hundred dollars. Much dental care can be postponed almost indefinitely, and since there is a wide range of treatment choices available to the dentist and the insured, the choice of treatment alternatives creates an uncertainty in benefit amount (e.g., the choice of gold versus amalgam fillings or extractions and bridges versus root canal and crowns). Claim expenses are high at the inception of coverage, because there is usually a backlog of unmet needs that result from neglect and disease before the effective date of insurance. Prepaid dentistry is more like a pooled budgeting mechanism than true catastrophic indemnity insurance. A viable dental program must combine common medical insurance concepts with some new mechanisms. Some of these mechanisms are, in addition to the participating doctor arrangements, direct payments to participating doctors, no balance billing, medical necessity and a prohibition against assignment of benefits. New mechanisms introduced by the dental program included the concept of predetermination, the less costly but adequate treatment alternative and a provision for excepted dentists (i.e., a group of dentists excepted from Blue Shield's auditing requirements).

Blue Shield believes that for a UCR system to operate effectively, it must be based upon a uniform usual charge submitted by a practitioner for reimbursement. A two-tiered charge structure whereby a practitioner charges his uninsured patients a lower fee for a service than his insured patients makes the UCR reimbursement system less economical, less workable and less marketable for Blue Shield. Blue Shield asserts that many dentists in Pennsylvania have been charging their insured patients more than their non-insured patients.

Despite the PDA's initial approval of the Blue Shield proposed dental program in 1970, dentists in this cottage industry had some misunderstandings about Blue Shield's dental program. Such misunderstandings filtered up to organized dentistry which reacted in different ways across the state and across the country. Some dentists objected to a perceived intrusion of third-party carriers, particularly service corporations like Blue Shield and Delta Dental, in their practices. Those dentists wished to preserve the traditional relationship between dentist and patient. The traditional school of thought believed it best not to participate contractually with Blue Shield or Delta Dental. Blue Shield believes that the motivation of these dentists was principally economic, although these dentists cited health factors in their opposition. Blue Shield asserts that these dentists wanted to maintain the traditional economic relationship between dentist and patient, yet obtain direct payment from insurance companies pursuant to an assignment of the patients' benefits to the dentist and that these dentists believed that carriers such as Blue Shield, Delta Dental and commercial insurance companies should merely be conduits for funds. These dentists did not wish to be second-guessed in their diagnoses and treatment of patients, nor did they want to submit diagnostic aids such as x-rays and study models to be scrutinized by insurance carriers. Blue Shield acknowledges that part of this school of thought was philosophical—dental professionals did not want third parties to intrude into traditional areas of dental practice— but asserts that the dentists' objections were primarily economic. Blue Shield asserts that traditional dentists believed they could collectively dictate the terms on which they would deal with third-party carriers if all or a majority of dentists refused to cooperate with Blue Shield and Delta Dental.

A confrontation ensued between the dentist-traditionalists and third-party carriers seeking to implement sufficient but reasonable cost containment mechanisms. Blue Shield and other insurance companies viewed themselves as more than mere financial intermediaries. Blue Shield considered itself to represent subscribers as bargainers of quality and cost of treatment. Blue Shield's marketing to employer groups is premised on this concept. Blue Shield perceived itself as a substitute agent in an economic sense for its subscribers. Some dentist-traditionalists viewed this role as an unwarranted intrusion into the traditional dentist-patient relationship.

On September 9, 1974, the Executive Board of the Erie County Dental Association, Inc. (ECDA), a counterclaim defendant, recommended that the ECDA membership drop participating doctor relationships. On September 12, 1974, the ECDA adopted a resolution opposing the concept of participating dentists and recommended that its members withdraw from any list of participating dentists and render services only as non-participating dentists.

Counterclaim defendant Charles Ludwig, D.D.S. holds himself out as an expert in dental prepayment, and has published on the topic of self-insurance. Dr. Ludwig is a member of the Harrisburg Area Dental Society (HADS) and was trustee of the Fifth District Dental Society to the Pennsylvania Dental Association for a number of years. Dr. Ludwig is the PDA's President-elect. In October of 1974, counterclaim defendant Harrisburg Area Dental Society published a document called its Dental Insurance Manual, which was disseminated to dentists and others statewide and beyond. Dr. Charles Ludwig was an author of the manual. Dr. Ludwig also extensively lectured on the topic of prepayment. He and the HADS Dental Insurance Manual have persistently advocated non-participation with third-party payers, have advocated a uniform and unified position of organized dentistry with respect to third-party payment, and have opposed submitting any diagnostic aids such as x-rays or study models to any third-party payers to substantiate claims for payment.

On October 3, 1974, counterclaim defendant Fifth District Dental Society, which includes as components local dental socie-

ties including counterclaim defendants HADS and York County Dental Society, adopted a resolution recommending to its membership that they avoid contractual relationships with third parties and not sign contracts or agreements implying or registering them as participating dentists. The Fifth District Dental Society's resolution of October 3, 1974 has not been rescinded. The Fifth District's resolution led to mass resignations from Blue Shield participation among dentists in the Fifth District of the PDA and Blue Shield still suffers from the effects of such resignations today.

A number of dentists from the HADS, including Dr. Ludwig, visited counterclaim defendant Scranton District Dental Society in November of 1974 and spoke to the Scranton Society espousing their traditional views against participation with Blue Shield (and Delta Dental). At the Scranton meeting, the Scranton District Dental Society adopted a resolution that its members should not sign contractual agreements with third parties registering them as participating dentists. The resolution led to mass resignations from Blue Shield participation in the Scranton area. That resolution has not been rescinded.

Counterclaim defendant Luzerne County Dental Society passed a resolution in December of 1974 requesting its members to become non-participants in the Blue Shield dental program. That resolution is still in effect. That resolution led to mass resignations in the Luzerne County area.

In December of 1974, HADS adopted a resolution that its membership should avoid contractual agreements with third parties and should not sign contracts or agreements registering them as participating dentists in a program. Dr. Charles Ludwig introduced that resolution. In addition, a written pledge was circulated at the HADS' December, 1974 meeting pledging that the dentists-members of the HADS are non-participating dentists in any third-party program or that they will resign from such contractual participation. Following the HADS' departicipation resolution, many dentists resigned as Blue Shield participants.

The HADS held meetings with dentists and attempted to persuade the HADS membership into departicipation on a more individual basis. There is no evidence of any coercion, nor any evidence that participating dentists had any reason for concern about any negative effects of exercising independent judgment about participating with third-party insurers.

Blue Shield used outside dental consultants and advisors for its dental program and had developed a quality assurance program at the urging of the then Pennsylvania Insurance Commissioner, Herbert Denenberg. Early in 1974, the PDA objected to Blue Shield's publication of lists of participating dentists. In the fall of 1974, the PDA sponsored a series of workshops for dentists on the topic of dental prepayment programs. At a workshop held on October 23, 1974, there was a great amount of discussion regarding participation with Blue Shield. The majority of those present opposed participation with Blue Shield and suggested that the PDA seek a meeting with officials of Blue Shield. The PDA invited officials of Blue Shield to attend the December 12, 1974 PDA Board of Trustees meeting in Harrisburg. Dr. Booth, the PDA President, told Blue Shield representatives at the meeting that the PDA had many areas of concern with Blue Shield but most important was the "contractual agreement, or participation, that [Blue Shield] use[s] to control dentists." He stated that PDA members statewide were disturbed by Blue Shield practices as evidenced by the then recent Scranton area mass resignations. He stated that the PDA membership had complained of preauthorization (also known as predetermination), the operation of the UCR system and the distribution of lists of participating doctors, all of which concepts were not in the best interest of patients and of dentistry's efforts to deliver *optimal* dental care. He remarked that unless Blue Shield and the PDA could come to a reasonable resolution of these disputes, he and the other PDA Trustees

would have no alternative but to resign their participation with Blue Shield and inform the PDA membership of the reasons for their resignations. Dr. Booth's remarks were set forth in the minutes of the December 12, 1974 PDA Trustee's meeting and were also reported verbatim to some dentists.

In subsequent communications PDA representatives objected to the requirement that participating doctors accept Blue Shield's allowance as payment in full for covered services; to the rule that Blue Shield subscriber-patients of non-participating doctors could not assign their benefits and to Blue Shield's provision for preauthorization (predetermination). Blue Shield declined to change the fundamentals of the way Blue Shield was conducting its dental program.

In his address to the 1975 PDA House of Delegates Annual Meeting, Dr. Booth summarized PDA's objections to Blue Shield's dental program and expressed the hope that the negotiation process with Blue Shield would persuade Blue Shield to make changes.

At the January, 1975 installation of officers of counterclaim defendant HADS, HADS' incoming President Bubeck, as part of his inauguration address, urged all HADS members who had not yet resigned (from Blue Shield and Delta Dental) to do so, citing as the principal reason that the dentists should not come under the control of a third-party insurance company as to either fees to be charged or treatment decisions. Dr. Burbeck noted that insurance companies accused dentists of incompetency and dishonesty in an effort to win support for their role as a monitor of the quality of dental care, and proposed that dentists retain control over the matter of quality of care by self-regulation within the profession.

Counterclaim defendant York County Dental Society passed a resolution in 1975 that its membership should not be participating members of any third-party prepayment program. That resolution has not been rescinded. More than 85% of the general dentists in the York County area sent in letters of resignation to Blue Shield.

In April 1975, counterclaim defendant Montgomery-Bucks Dental Society passed a resolution urging its members to resign from participation with Blue Shield, because of Blue Shield's efforts to control fees and treatment decisions. That resolution has not been rescinded. Resignations from Blue Shield participation ensued in that area.

In the spring of 1975, counterclaim defendant Dr. Charles Ludwig traveled to Erie, Pennsylvania to address the membership of counterclaim defendant ECDA, giving his views on participation with Blue Shield. In 1975, the ECDA reaffirmed its September 12, 1974 departicipation resolution. Resignations from Blue Shield participation in the Erie area occurred. The ECDA's position regarding non-participation was reaffirmed again in the 1980s.

In 1975, the PDA House of Delegates adopted new Standards for the Design of Prepayment Programs. Those Standards were renamed Guidelines in 1978. They are still in effect. They include, *inter alia:*

Standard No. 5. There shall be no administrative, promotional or educational policies adopted which interfere with the dentist-patient relationship.

Standard No. 6. Contractual agreements between dentists and carriers which compromise or interfere with the dentist's ability to provide optimal dental care should be avoided.

Standard No. 7. Diagnosis and treatment planning shall remain the exclusive prerogative of the attending dentist. Preauthorization by the carrier shall be limited to predetermination of the insured patient's eligibility and the extent of benefits provided by the program. Diagnostic materials are not required in this determination.

Standard No. 14. The program shall have a provision for the assignment of the patient's benefits to the dentist.

The percentage of Blue Shield participating dentists statewide as compared to all

dentists who submitted claims to Blue Shield declined from in excess of 72% in 1974 to less than 54% in the early 1980s. Blue Shield claims that the decline in the numbers of participating dentists harmed Blue Shield's marketing efforts statewide, particularly in certain areas, such as northwestern Pennsylvania (the Erie area), central Pennsylvania (Fifth District, HADS, York County, etc.) and northeastern Pennsylvania.

The President of the Fifth District Dental Society in 1981 lectured a Hanover Dental Society meeting to the effect that no one should participate with Blue Shield and that if no one participates, Blue Shield would not be able to sell its insurance programs.

The PDA rejected a Blue Shield advertisement which Blue Shield attempted to place in the PDA's official publication, the Pennsylvania Dental Journal, by which Blue Shield sought to encourage dentists to participate with Blue Shield. The Journal is the official publication of the PDA. It is the only statewide periodical for dentists.

In 1978, the HADS sought and obtained an opinion of counsel (Mr. Beckley) who reviewed the HADS Dental Insurance Manual. Acting upon Mr. Beckley's advice, HADS passed a resolution suspending all policies and guidelines regarding third-party programs. Blue Shield attributes this development to an apprehension among some dentists that their policies might be in violation of antitrust law principles. The suspension resolution of HADS was not distributed to all dentists. No effort was made to nullify the effects of the HADS 1974 departicipation pledge. While gradually more dentists from HADS have participated with Blue Shield, the percentage of their participation has never reached the pre-1975 level of participation. All of the other societies and associations in this case still have their departicipation resolutions or recommendations of record.

In 1978, Esther Richwine, the PDA Executive Director, stated publicly that due to concerns regarding the FTC, Mr. Beckley, PDA counsel, was auditing the minutes of the PDA.

Commencing in 1977, the PDA began to challenge and protest virtually every filing made by Blue Shield with the Insurance Department or the Health Department which involved or affected Blue Shield's dental program and initiated a number of court proceedings against or involving Blue Shield. Blue Shield asserts that the purpose of these challenges, protests and legal actions was to coerce Blue Shield to change its business practices so as to reduce price competition among dentists and to preserve the private practice fee-for-service method of financing dental services.

Blue Shield initiated an in-office review program (IOR). The PDA advised its membership on how to deal with Blue Shield audit requests. The PDA developed two types of audit forms letters—one for participating dentists and one for non-participating dentists. Since 1977, the PDA has advised dentists that disclosing non-insured patient records to Blue Shield during an IOR might be an invasion of the patient's right to privacy. Many dentists did not permit Blue Shield to verify that they were not charging Blue Shield more than their usual charges. The PDA also sent observers to attend audits and developed written guidelines (to which insurers were asked to adhere) with respect to audits.

PDA's audit advice to dentists caused some dentists to believe that they should not disclose non-insured patient records as part of Blue Shield's IORs. This impaired Blue Shield's IOR program.

Blue Shield believes that many dentists have been overcharging Blue Shield by charging Blue Shield subscribers more because they have insurance. A number of dentists have resigned upon being notified of an audit by Blue Shield and a large percentage have refused to disclose their non-insured patient records.

Counterclaim defendant Theodore R. Paladino is a lawyer as well as a dentist. As an attorney, he has represented dozens of dentists regarding Blue Shield audits and has represented some dentists before Blue

Shield's dental review committee. Dr. Paladino consistently has advised his clients that he questioned Blue Shield's authority to audit them and that they were not obligated to disclose non-insured patient records to Blue Shield.

Blue Shield sought the Department of Health's approval to amend its regulations for participating doctors a number of times to eliminate the basis for some of the objections being raised by Dr. Paladino and the PDA as to Blue Shield's right to audit and inspect records. Blue Shield sought to amend its Regulations for Participating Doctors before the Department of Health regarding its procedure for verifying usual charges, and Dr. Paladino and the PDA filed objections. The Fifth District Dental Society (and Dr. Ludwig) also commented negatively on Blue Shield's effort to amend its Regulations for Participating Doctors regarding verification of usual charges. The Department of Health approved verification of usual charges (by inspecting non-insured patient records), thus expressly permitting Blue Shield to examine non-insured patient records provided that the identities of such patients were concealed. PDA unsuccessfully appealed such approval to the appellate courts of Pennsylvania.

Blue Shield views dentists' resistance to its IORs as a concerted effort by the dentists to cover up potential fraud and abuse.

Some of the dentists supported a resolution in the Pennsylvania legislature. They inspired House Resolution 15, adopted by the Pennsylvania House of Representatives in March 1981, which called for the scrutiny of health service corporations operating under the Blue Shield Regulatory Act.

House Representative Charles Laughlin from Aliquippa, Beaver County, Pennsylvania is a patient and friend of Dr. Gerald Kolavic. Blue Shield had audited Dr. Kolavic, who was also one of Dr. Paladino's clients, and he was found to have improperly overcharged Blue Shield.

In 1980, counterclaim defendant Odontological Society of Western Pennsylvania formed a committee consisting of predominantly dentists. Commencing in 1980, the committee held a number of meetings. There was a meeting held on June 20, 1980 in Sewickley, Pennsylvania. Counterclaim defendants Drs. Ludwig, Paladino and Perkins attended and participated at this meeting. During the meeting, some of the dentists told a member of the Pennsylvania House of Representatives who was present that Blue Shield interferes with dentist-patient relationships by limiting certain coverage and that the only third-party payer causing problems for dentists and consumers is Blue Shield.

Another meeting concerning Blue Shield was held in Pittsburgh on November 13, 1980. More than 300 dentists attended the meeting. At the November 13, 1980 meeting, someone stated that it was permissible to charge a higher fee if a patient had insurance so long as more than half of a dentist's practice consisted of insured patients. Statements were also made at that meeting that there were not many Blue Shield participating dentists compared to the number of dentists in the state and that dentists, through resignation *en masse*, could force Blue Shield to deal with dentists on the dentists' terms.

During the November 13, 1980 meeting some of the dentists told a member of the House of Representatives who attended that, sooner or later, all Blue Shield participating dentists will be audited by Blue Shield, that Blue Shield always asks for a refund after conducting an audit, that Blue Shield had, to that date, conducted 600 audits, that a dentist's usual charge would be reduced if he charged less to patients such as clergymen and relatives, and that third-party carriers cheat patients.

As a result of the adoption of House Resolution 15, as noted, *supra*, the House Consumer Affairs Committee held several hearings throughout the state to ascertain if the Blue Shield Regulatory Act should be amended. Counterclaim defendants Thompson, Ludwig, Paladino and Perkins (and others) were involved in much of the anti-Blue Shield testimony presented at these legislative hearings. Subsequent to the hearings a number of legislative bills

were introduced by dentists which largely sought to amend the Blue Shield Regulatory Act in ways which would significantly change Blue Shield's dental program. The legislation would have permitted the assignment of benefits to dentists and would have turned Blue Shield claims disputes over to a PDA-controlled Peer Review System; would have required the Blue Shield Dental Review Committee to hold hearings for adjustments of individual claims; and would have required Blue Shield to update dentists' profiles even though Blue Shield suspected fraud.

In 1980 Blue Shield sought the approval of the Departments of Health and Insurance to implement an experimental dual choice capitation program for employees of the Fairless Hills Works of U.S. Steel located in the Levittown/Fairless Hills suburbs of Philadelphia.[4] This capitation program was known as DentalPLUS. Some of the counterclaim defendants, including PDA, protested these filings. Both Departments approved Blue Shield's DentalPLUS filings.

The PDA appealed to the Commonwealth Court and to the Supreme Court of Pennsylvania. These protests delayed implementation of the DentalPLUS and other Blue Shield capitation programs. Blue Shield contracted with two dental offices to act as dental capitation centers to provide dental services to DentalPLUS subscribers and obtained a verbal commitment from the University of Pennsylvania to likewise participate as a dental capitation center for DentalPLUS.

A group of dentists, most of whom were members of the counterclaim defendant Montgomery-Bucks Dental Society, formed an unincorporated association which they called the Delaware Valley Central Society to compete with DentalPLUS.

The PDA Central Office provided form letters for Delaware Valley Dental Society dentists to send to their patients soliciting their choice of that Society over Dental-PLUS. Delaware Valley Dental Society

successfully pressured the University of Pennsylvania to withdrawn from the Blue Shield DentalPLUS program. DVDS members also contacted Temple University School of Dentistry to dissuade Temple from participating in DentalPLUS and encouraged steelworkers not to enroll in the Blue Shield DentalPLUS capitation program. At its 1981 Annual Meeting the PDA House of Delegates adopted a resolution which stated that the PDA was not in favor of capitation programs.

PDA's Council on Dental Care Programs developed a Dental Prepayment Guide to give dentistry's point of view to prospective purchasers of prepaid dental programs in Pennsylvania. The Dental Prepayment Guide was designed to be used with the Dentists' consulting service to advise Pennsylvania companies on the types of programs available and to educate them "on what is a good program and what is not." The PDA Council disseminated the Dental Prepayment Guide to thousands of companies statewide.

The PDA also developed a purchaser contact program to train a cadre of 50 or more dentists statewide. The PDA's consulting service used the PDA's Standards for Dental Prepayment Programs and its Guidelines for Dental Prepayment Programs as criteria to determine what was, or was not, a good program. Blue Shield's dental programs did not comport with PDA's Standards or Guidelines.

Dr. Booth, former President of the PDA became an expert on prepayment programs and became an advisor to PDA's Council on Dental Care Programs and actively participated in seminars and workshops on how to train this 50-dentist purchaser contact cadre. Booth visited a representative of the United Steelworkers of America and an official of the United States Steel Corporation (these were and are existing Blue Shield accounts) in 1981 and made statements to those accounts to the effect that Blue Shield rarely pays for crowns and that

---

**4.** A capitation program provides for treatment by a specific group of physicians for the insured patients.

Blue Shield makes arbitrary administrative decisions.

An August 9, 1979 internal PDA memorandum contains an indication that PDA member dentists discussed Blue Shield coverage with Blue Shield accounts. A member of counterclaim defendant Odontological Society of Western Pennsylvania sent a letter to colleagues urging them to contact Blue Shield's existing accounts and urge those accounts to drop Blue Shield and pick up other coverage when the time came to renew coverage.

In 1977, counterclaim defendants ECDA formed a committee known as its Ad-Hoc Committee for the purpose of investigating professionalism, free enterprise and comraderie.

The ECDA held a series of workshops in 1980–1981 which were attended by about 120 out of the approximately 170 members of the ECDA. The ECDA prepared a special supplement to the PDA's Dental Prepayment Guide. This ECDA Dental Prepayment Guide Supplement was used to assist the Dental Care Committee of the ECDA in contacting prospective purchasers of dental prepayment programs in the Erie area. That practice operated to disparage Blue Shield's dental program. For example, the ECDA Supplement stated that a carrier's in-office accounting review services can only be carried out in an area where all dentists are participating.

ECDA representatives met with prospective purchasers of dental insurance in the Erie area and gave presentations which Blue Shield perceives to have been unfairly slanted against it.

Counterclaim defendants ECDA, Dr. Charles Ludwig and the Fifth District Dental Society have made statements in recent years to the effect that Blue Shield misleads prospective purchasers in areas where there is low Blue Shield participation as to its service benefit feature because paid-in-full dental service benefits are not available if there are not many participating dentists.

Representatives of counterclaim defendants York County Dental Society, Scranton Dental Society and HADS have similarly visited accounts and prospective accounts of Blue Shield.

Some of the dentists have promoted the concept of self-insurance or direct payment programs to combat Blue Shield. Dr. Ludwig has written on the topic of promoting the concept of self-insurance and he is engaged in a personal private enterprise of conducting business as a consultant in self-insurance and direct payment.

## II. DISCUSSION.

Summary judgment in an antitrust case is to be sparingly granted, particularly if it appears that there are factual questions presented as to the motive and intent of alleged conspirators, *Poller v. Columbia Broadcasting*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). "Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even-handed justice.'" *Poller, supra*, at 473, 82 S.Ct. at 491. Here there is no demand for a jury trial. The same theories and evidence which would be presented to the Court at a non-jury trial are now before the Court in the context of the motion for summary judgment.

An antitrust case, like any case, is subject to analysis under F.R.C.P. 56 and summary judgment is appropriate if there are no material facts in dispute. "... [A]ntitrust litigation, if made immune from summary judgment, could become an anticompetitive activity itself ... we should use summary dispositions to dispose of antitrust complaints that lack any significant supporting evidence." *Klamath-Lake Pharmaceutical Assn. v. Klamath Medical Service*, 701 F.2d 1276 at 1281–1282 (9th Cir.1983). When there are not credibility issues impacting upon the determination of material factual questions, when the decision of the case boils down to drawing inferences from a history of events which is not materially in dispute, when all of the material evidence is before the Court, and when no jury trial is demanded, there is

scant reason to defer decision of the issues presented until a trial has been held.

## A. SHERMAN ACT, SECTION ONE.

■ The two basic elements of a cause of action under Section 1 of the Sherman Act are, first, that the defendants(s) entered into a contract, combination or conspiracy and, second, that the contract, combination or conspiracy restrains trade. *Sitkim Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440 (3d Cir.1978); *Medical Arts Pharmacy v. Blue Cross & Blue Shield*, 518 F.Supp. 1100 (D.Conn.1981). The United States Supreme Court, early in the history of the Sherman Act, interpreted the Section 1 prohibition to require an analysis addressed to the reasonableness of a trade restraint, since virtually all contracts can be viewed to restrain trade in some respect. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). While some business practices, such as horizontal price fixing among competitors, have been judicially determined to be unreasonable *per se* "because of their pernicious effect on competition and lack of any redeeming virtue," *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), the categories of *per se* antitrust violations are narrowly and carefully defined, and most allegations that particular business practices constitute antitrust violations are to be analyzed under the "rule of reason." Under this rule, the essential analysis is whether the practice in question is anticompetitive. See, *National Society of Professional Engineers v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978).

... not every agreement that has an impact on price, either vertically or horizontally is a *per se* violation of the Sherman Act. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979). For example, a contract for the sale of goods 'fixes' the price at which the goods are to be sold, but such a contract is not *per se* illegal, absent a showing of some adverse impact on competition. *Cf. United States v. Topco Associates Inc.*, 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). The proper inquiry, thus, is not whether a particular agreement literally fixes a price, but whether the agreement is so 'plainly anticompetitive' and so very likely without 'redeeming virtue' that a court will apply the label '*per se* price fixing.' *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, supra, 441 U.S., at 8–9, 99 S.Ct. at 1556–1557.

Blue Shield seeks by this antitrust action to have the Court consider in one civil action an extremely broad range of incidents, statements, policies, practices and issues.

However, the essence of Blue Shield's claim is that the dentists conspired to boycott Blue Shield's participating dentist program and thereby to harm Blue Shield as a seller of dental insurance. An analysis of Blue Shield's claim can not go forward under antitrust cases and principles without deciding first what market or markets are involved here and what relationship the dentists and Blue Shield bear to each other in the context of those markets.

### 1. RELEVANT MARKET.

■ We begin with the most obvious market, the market in which dental services are sold by dentists. In this market, dental services are purchased by individuals who need dental services, but in this market dental services are also purchased by suppliers of prepaid dental services such as Blue Shield, who buy dental services in bulk pursuant to the "participating dentist" program and sell them to the individuals insured under their insurance policies.[5]

---

**5.** When insured dental patients buy dental services from dentists in this market, pay the dentist directly, and receive reimbursement from the insurance company, the insurance company is not a purchaser of dental services.

This market we identify for purposes of this Opinion as Market I.[6] Blue Shield can not logically or reasonably claim to be the victim of a boycott in Market I. There is absolutely no evidence, or even any suggestion, that in Market I the dentists ever were or ever would be unwilling to sell dental services to Blue Shield on the same terms as and at the same price as dental services are sold by the dentists to every other purchaser in that market. The fact is that Blue Shield is not offering to buy dental services at the same price and under the same conditions as other purchasers. It seeks to impose a host of conditions upon its purchase of dental services in Market I. It seeks compliance on the dentist's part with audits, predeterminations of treatment plans subject to Blue Shield's approval, and a lot of other things from the dentist that the dentist does not dispense to his other patients. In some instances, depending upon the dentist's usual fee and the result of Blue Shield's UCR calculation, it seeks to have the dentist sell his services to it at a discount. No principle of antitrust law or of free trade requires the dentists to sell their services to a particular purchaser at a discount or under terms and conditions not applicable to other customers. We think that our analysis of this case might very well end at this point, particularly when Blue Shield itself deems Market I to be the relevant market, since there is no evidence that the dentists have sought to or have fixed prices in Market I. See, pages 45–47, below.

In our Order of February 7, 1986, we suggested that another market may be the relevant market here, the market in which Blue Shield sells and dentists buy Blue Shield's "participating dentist" status. We will call this Market II. Blue Shield

submits that this characterization is in error, in part because for purposes of the dentists' claims we perceived the principal relevant market to be the market in which dental services are sold. We find there to be no requirement in law or in logic that, for purposes of different claims by different parties, different markets may not be considered. Furthermore, we think that the evidence establishes quite clearly that the dentists' disagreement with Blue Shield and their departicipation goes not to Blue Shield's presence in Market I as a buyer of dental services, but rather to Blue Shield's presence in Market II as a seller of "participating dentist" status.

Blue Shield also appears to assert that the characterization of the relevant market is irrelevant to the legality of the dentists' boycott. We do not think so. On the contrary, we think that Blue Shield's failure to identify the relevant market has resulted in Blue Shield having no clear and discernible theory of its case and in a profusion of arguments and theories on Blue Shield's part, none of which is clearly rooted in established antitrust principles. We will, however, address these theories to the extent that it is possible to do so.

### 2. BOYCOTT BY DENTISTS OF BLUE SHIELD.

The Sherman Act prohibits conspiracies and combinations in restraint of trade, including boycotts and concerted refusals to deal. Blue Shield is not a buyer on equal terms with other buyers of dental services in Market I, and thus any concerted refusal on the dentists' part to deal with Blue Shield on its terms is not a boycott of a buyer in Market I, the relevant market. And there is no evidence that the dentists

---

6. Blue Shield considers this to be the relevant market for purposes of this case.

"... [A] Blue Shield plan's status as a buyer and providers' status as sellers of services is basic to the application of the antitrust laws to health care reimbursement, *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 214 [99 S.Ct. 1067, 1074, 59 L.Ed.2d 1] (1979). See also, *Maricopa, supra; Va. Academy of Clinical Psy. v. Blue Shield of Va.*,

624 F.2d 476, 480, 483 (4th Cir.1980). Blue Shield pays for services rendered its subscribers, either to the par dentist or the subscriber, and the dentist receives payment for his services. The essence of the parties' relationship and their dispute revolves around Blue Shield's terms and conditions of payment and the Dentists' collective opposition thereto."
Blue Shield brief, Doc. 983, pages 13–14.

could or would want to affect Blue Shield's success in the market place as a vendor of dental insurance so long as individual dentists' fees were not affected and dentists were not required to submit to audits, peer review and all of the other conditions incidental to "participating dentist" status. There is, on the other hand, no doubt that the dentists have the capacity to affect, by concerted action, Blue Shield's success as a seller of fixed rate prepaid dental services policies which have the feature that the insured patient, so long as he goes to a participating dentist, will not have to pay any additional sum for covered services.

We have closely reviewed Blue Shield's evidence. We preface our discussion of the boycott issue with the following observations.

1. We have no evidence presented that Market I is not a free market. There is no evidence of aberrations of supply or of demand and no evidence that dentists do not, on an individual dentist-by-dentist basis, set and charge fees on the basis of such appropriate factors as the individual dentist's skills, the complexity of the service and the volume of patients seeking the dentist's services.

■ 2. There is no evidence presented that the purpose or the effect of the dentists' departicipation was to fix dental fees or to stabilize them. Although Blue Shield contends in a conclusory fashion that this is the purpose and effect, there is no evidence of it. Blue Shield infers it from the fact that its rate of payment to participating dentists is generally lower than the fee those dentists otherwise charge. But if Market I is a free market, Blue Shield's inference is unreasonable. The reasonable inference is that already stated herein: Blue Shield is not truly a buyer of dental services in Market I because it will not pay the market price in that market.

In this regard, we note and distinguish the FTC decision in *Michigan State Medical Society,* upon which Blue Shield relies.

Opinion appended to Doc. 983. There, the concerted conduct of the physicians was aimed at raising Blue Cross/Blue Shield reimbursement rates, and therefore the objective of the physicians' boycott was to affect and raise prices. There is no such evidence here. Here, the evidence plainly reveals that the dentists' efforts over the years was directed at preserving a traditional fee-for-services relationship between dentist and patient and against the participating dentist concept. Here, at best, Blue Shield's case is that the dentists conspired among themselves to be, each of them, independent economic entities in Market I. They conspired not to march to the same drummer by way of the participating dentist concept. They conspired and acted in concert, if anything, to preserve a market which the facts do not show to be anything other than a free market.

■ 3. There is no evidence here of any coercive conduct on the dentists' part. There is abundant evidence that they sought to persuade, as individuals and as associations. They resolved, as groups of dentists in their associations, not to be participating dentists. Some communicated the message, in lectures and otherwise, that their concerted action could serve to destroy the "participating dentist" approach to the practice of dentistry. But there is no evidence that they devised or communicated any sanctions that they would take against other dentists, other entities or other persons if their message was not accepted. Thus, this case is distinguished from, for example, *American Medical Association v. United States,* 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943),[7] in which doctors and their associations devised a scheme of sanctions against other doctors and hospitals for participating in a risk-sharing prepayment plan for the rendering of medical services.

4. It must be inferred from the evidence that the dentists and associations were not

7. See, also, *United States v. American Medical Association,* 110 F.2d 703 (D.C.Cir.1940); 130 F.2d 233 (D.C.Cir.1942).

speaking and acting with respect to Blue Shield as an entity, although frequently they referred to Blue Shield as the embodiment of their bone of contention; in fact, their bone of contention and the object of their resolutions and concerted action was the concept of practicing dentistry under the "participating dentist" system.

Blue Shield's evidence is not that the dentists conspired against Blue Shield as an entity. They objected to a concept— participating dentist status—and the impact of that concept upon the practice of dentistry. In some respects and in some instances, the more or less collective reasoning of many of the dentists, that participating dentist status was undesirable, was manifested in vocalizations against Blue Shield as an entity, but it is clear that it was not the objective and was not the effect of the dentists' actions to harm Blue Shield competitively.

5. Blue Shield certainly seeks to have its cake and eat it too. It initiated and encouraged an institutional response from the dentists to its "participating dentist" program from the dentists, and so long as everything was "coming up roses"[8] it had no concern that the dentists were acting in concert to become "participating" dentists. When the dentists, somewhat institutionally and somewhat in concert, in the face of an unyielding Blue Shield that by then enjoyed considerable success with its participating dentist program, acted to no longer "participate", it yelled foul and claimed an antitrust violation. We think it obvious that the very notion of participating dentist status and all of the elements of Blue Shield's program contemplates and virtually requires an institutional reaction from the dental profession. At the very least, Blue Shield may not fairly have it both ways; it may not initiate dealings with the dentists and dental associations collectively and then claim an antitrust violation on the basis of the dentists' collective response.

6. The "participating dentist" system constitutes a major revision of relationships and practices in a market which Blue Shield characterizes as being, as of the 1960s and early 1970s, "still a cottage industry ... one of the last bastions of rugged individualism." Blue Shield brief, Doc. 972, p. 12. The "participating dentist" system was not born of the natural interaction of free market forces or from the development of a product having a natural or inherent commercial worth; rather, it depended for its birth upon statutes of the Pennsylvania General Assembly and other actions of Pennsylvania government. Apart from the implications of these factors upon the merits of the dentists' *Noerr-Pennington*[9] political expression defenses here, the fact is that the emergence of the participating dentist system into the dentists' workplace did not constitute so much the entry of a new competitor or a new product into the market place, but rather the entry of a prospective new set of rules, policies and operating procedures. Dentists did not want to be second-guessed in their diagnoses and treatment of patients and they did not want to submit x-rays and study models to be scrutinized by insurance carriers. Blue Shield and other insurance companies viewed themselves as more than mere financial intermediaries, but also as representing subscribers as bargainers of quality and cost of treatment. Thus, this observation is warranted: Blue Shield, which is unwilling in this antitrust case to commit itself to a position which incorporates the traditional building blocks of antitrust analysis (a relevant market and a particular product), and also seeks to protect by this litigation not so much a product as a system which incorporates features of policy and law as much as the features of a product, is seeking a result which would incapacitate the dentists from speaking out collectively and acting collectively with respect to this system.

8. Blue Shield's brief, Doc. 972, p. 16.

9. *Eastern Railroads' Railroad Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct.

523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

If Blue Shield may enter upon the scene of an industry such as the practice of dentistry and may impose a wholly different and arguably quite artificial new set of economic relationships between dentists and patients, may initiate practices which (although they do not violate the antitrust laws) may tend to influence a dentist's fees and charging policies, there is no conceivable reason why the antitrust laws should prohibit the dentists from discussing such a development or from deciding collectively to remain, as it were, independent market entities. There is certainly no evidence that the dentists "conspired" to do more than that; *i.e.,* to maintain an industry of individual practitioners charging, on an individual dentist basis, what the market will bear. They did not by any stretch of the evidence conspire to fix prices; in truth, they viewed Blue Shield as the price fixer.

Having established our frame of reference by these foregoing observations, we turn to the question whether there are any facts presented by Blue Shield in connection with this Rule 56 motion which could, if proven, establish that a violation of the Sherman Act *per se* has occurred or that a violation has occurred by application of the rule of reason.

## 3. PER SE VIOLATION.

■ One of Blue Shield's arguments is that the dentists and associations violated the Sherman Act *per se* because their conduct stabilized prices in Market I (or sought to). They explain this argument by asserting that the dentists' opposition to Blue Shield's "discount pricing" was and is a substantial factor in their boycott activity. Blue Shield asserts that "[t]he evidence also shows that collective opposition to discount pricing, by non-participation, re-

duced the risk that non-pars would lose Blue Shield subscriber patients to pars. By collectively refusing to participate, dentists could balance bill *and* retain their patient volume." Blue Shield brief, Doc. 983, p. 11. Simplified, and considered in view of the facts cited by Blue Shield, this argument says nothing more than that the dentists, by refusing to become or remain participating dentists, could bill their patients their ordinary fee. Since Blue Shield has not shown that for individual dentists acting unilaterally to bill their ordinary fee in the presumptively free market for dental services had any tendency to fix or stabilize prices, there is no conceivable basis in the facts presented for the Court to find that the dentists' activities amounted to price fixing.[10]

■ The cases cited by Blue Shield in support of its *per se* argument are not analogous to this case. In *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), oil companies and individuals had been acting in concert to purchase cheap (distress) gasoline, to keep it off the market and thereby to raise and stabilize the market price for gasoline. Here, there is no proof of any purpose or effort to raise or to stabilize prices. The evidence shows the dentists to have been concerned about losing control as individual economic entities over their pricing practices, and that is not at all the same thing. Blue Shield's argument is premised upon the supposition that with sufficient participating dentists, dental prices would be lower. The Court has, however, already concluded that Blue Shield's programs do not have any inherent effect upon the pricing of dental services, *Pa. Dental Ass'n. v. Med. Serv. Ass'n. of*

---

**10.** Blue Shield intimates that the dentists sought to retain certain advantages of Blue Shield's presence in the market without doing business with Blue Shield. This is misleading. Blue Shield's practice, the record indicates, is to pay benefits to the patient when the dentist is not a participating dentist. Thus, the dentist's relationship to his patient is largely unaffected by Blue Shield's presence in the background as a third-party payor. To the extent that patients, because of insurance coverage, purchase services they would otherwise forego, that is merely a neutral factor arising naturally from the existence of this sort of insurance and nothing the dentists are responsible for. Furthermore, even if Blue Shield did pay non-participating dentists directly, thereby benefiting them by virtue of certainty of payment, that too would merely be a neutral factor arising from the existence of insurance coverage in the market.

*Pa.*, 574 F.Supp. at 467–468, a conclusion which Blue Shield in that context advocated. We have been presented with no sufficient basis here to alter that conclusion.

In *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 67 L.Ed.2d 580 (1980), the Court considered the antitrust implications of beer wholesalers agreeing to end granting credit to beer retailers, and concluded that such an agreement would violate the Sherman Act. The Court found this to be a horizontal agreement to fix prices. That case does not support Blue Shield's position here, because there is no proof or basis for inference that the dentists' decision not to be participating dentists tended to fix prices or to standardize pricing practices. Again, on the contrary, we have concluded already that the participating dentist/UCR factor is a neutral factor insofar as pricing is concerned, and the evidence here does not disturb that conclusion.

In *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), a group of doctors agreed together upon maximum prices to charge for certain services. As we said earlier, in reference to Blue Shield's participating doctor plan, "[h]ere there is no setting of a maximum fee, minimum fee or any fee at all." 574 F.Supp. at 465. We will not hear Blue Shield now to claim that the dentists acted in opposition to Blue Shield's discount pricing.

Blue Shield cites *St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978) in support of its companion contention of a *per se* violation based upon an unlawful group boycott. In *St. Paul Fire*, a group of physicians claimed that a group of insurance companies were boycotting them to coerce them to submit to new coverage ground rules. The issue there was whether the alleged boycott fell within the boycott exception to the general rule of antitrust immunity for the business of insurance under the McCarran-Ferguson Act. Blue Shield cites the case for the proposition that a boycott is "a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." 438 U.S. at 541, 98 S.Ct. at 2390. We can not conclude that the dentists boycotted Blue Shield. The evidence will not reasonably support such an inference. The dentists discussed and to some extent resolved not to be participating dentists, which happened to be a program which Blue Shield was trying to encourage. The dentists did not refuse to treat Blue Shield patients. They did not focus in their resolutions upon harming or boycotting Blue Shield as an entity, even though some individual speakers may have done so on a few occasions. They decided somewhat collectively that they did not want to become involved in a new and different system for the delivery of dental services, a system for which Blue Shield happened to be the principal sponsor. The dentists did not have a dispute with Blue Shield, and Blue Shield was not the dentists' target. The dentists had a dispute with the notion of third-party control over dentists' otherwise independent decision-making and the target of their dispute was the participating dentist system. That Blue Shield had a stake in that dispute does not make it a target of a boycott.

Even assuming *arguendo* that the evidence can be construed to support the inference that the dentists boycotted Blue Shield, there is not here a *per se* violation of the Sherman Act. " '[B]oycotts are not a unitary phenomenon.' P. Areeda, *Antitrust Analysis*, 381 (2d ed. 1974)." *St. Paul Fire*, 438 U.S. at 531, 98 S.Ct. at 2924. "[O]ne might even hold that any agreement affecting competitive behavior is necessarily an agreement that the collaborators will not buy or sell on any other terms; [footnote omitted] and there is no sharp logical distinction between refusing to sell at all and refusing to sell on condition." P. Areeda, *Antitrust Analysis*, 495–496 (3 ed. 1981). We have already concluded that Blue Shield's practices do not constitute an unlawful boycott of non-participating dentists. 574 F.Supp. at 468. Yet it is obvious

that Blue Shield does business with the non-participating dentists on much different terms than it does with participating dentists. We must recognize that Blue Shield did not enter the market in which it sells its participating dentist status to dentists, or the market in which it buys dental services from dentists, by negotiating with individual dentists. It sought to deal with the dentists as a group. If the dentists at that juncture had said as a group to Blue Shield that they (the dentists) would not agree to Blue Shield's terms, there would be no conceivable basis for Blue Shield to claim an antitrust violation. Under Blue Shield's own statement of the facts, what happened is that this process of negotiation persisted over a period of years until some of the dentists came to decide, more or less collectively, that they were not going to buy the package of which Blue Shield was the principal seller. Since Blue Shield in its own interests sought to and did deal with the dentists collectively, we do not believe that we now may find that collective action by the dentists constitutes an illegal *per se* group boycott. None of the cases cited by Blue Shield at pages 10–13 of its brief, Doc. 983, is inconsistent with this conclusion.

■ In *Indiana Federation of Dentists v. FTC*, 745 F.2d 1124 (7th Cir.1984), *cert. granted*, — U.S. —, 106 S.Ct. 225, 88 L.Ed.2d 224 (1985), the Court held that if there is concerted conduct by a group of competitors banding together to protect themselves from non-group competitors, there is an illegal *per se* boycott. If not, the rule of reason is applicable. Here, Blue Shield is not a competitor of the dentists in Market I or any other market. We think that the rule of reason is clearly applicable.

### 4. RULE OF REASON.

■ We turn to our examination of the dentists' conduct under the rule of reason. The test is whether, on balance, the challenged agreement is one that promotes competition or one that suppresses competition. *National Society of Professional Engineers v. United States*, 435 U.S. 679,

688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637. As already stated, we find there not to have been a boycott by the dentists of Blue Shield, but rather some discussion and agreement about not being participating dentists; *i.e.*, not agreeing to third-party payment, to treatment review, to audits, and so on. Likewise, we find there to have been no fixing of prices. However, assuming *arguendo* the existence of a colorable antitrust violation, we now consider whether the conduct of the dentists, as established by Blue Shield's evidence, was anticompetitive.

Blue Shield asserts that the evidence is overwhelming that the dentists' primary motivation in urging non-participation was economic. We do not find this to be true. The evidence establishes very clearly that the dentists objected to the non-economic requirements of participating dentist status and to the prospect of being answerable to a third-party entity as to the standard and nature of the services they were providing to their patients. They objected to having a third party review their treatment of a patient. They objected to submitting x-rays and treatment plans to a third party.

As we concluded, above, this case is not like the *Michigan State Medical Society* case upon which Blue Shield relies. Here, there was no effort by the dentists to influence reimbursement rates. This case, on the other hand, is more closely analogous to *Indiana Federation, supra*, where the dentists had acted collectively with respect to particular conditions which third party group dental health insurers sought to impose; *i.e.*, submission of x-ray forms to the insurer. The Court in that case concluded, first, that because there was no evidence that the dentists' practices were directed against competitors of the dentists (*i.e.*, other dentists), there was no *per se* antitrust violation and the rule of reason was applicable. The court then applied the rule of reason and concluded that no antitrust violation had occurred, because there was no anticompetitive effect upon any relevant market. In applying the rule of reason, the court noted and relied upon the fact

that the dentists were continuing to do business with the insurers; *i.e.*, they had not refused treatment of insured patients. The dentists merely had refused to comply with all of the conditions set forth by the insurers. Even though the insurers advanced these conditions as cost containment measures, the Court concluded that the dentists acted properly in joining together and deciding upon standards of dental care; even when that resulted in a concerted refusal by the dentists to deal with the insurers upon certain terms and conditions.

Here, as in the *Indiana Federation* case, the dentists did not refuse to deal with the health care insurers generally or with Blue Shield specifically. There is no evidence that the dentists did not treat Blue Shield patients. The concerted opposition here to "participating dentist" status is not materially distinguishable from the concerted refusal in *Indiana Federation* to comply with certain of the insurance companies' requirements. Blue Shield seeks to distinguish *Indiana Federation* by observing that "[t]herein, the refusal to deal involved withholding x-rays, a basic component of patient care. Herein, the Dentists refused to contract with Blue Shield at discount prices" Blue Shield brief, Doc. 983, p. 17. This distinction is based upon a view of the facts of this case which has no support in the record. We have already rejected the dentists' contention that Blue Shield's reimbursement mechanism sets prices, since each dentist is free to set his own price for dental services and to participate or not to participate with Blue Shield. 574 F.Supp. at 467–468. This conclusion, of course, does not foreclose the possibility that the

dentists' motivation in not participating with Blue Shield was economic, but it does require the inference that there is no inherent tendency of the participating dentist system to discount dental prices.[11] However, there is no other evidence before us which reasonably supports the inference that the dentists' and associations' resolutions to not be participating dentists had an anticompetitive effect.

On the basis of the observations we have stated above, at pages 670–672, which we will not repeat here, we find the dentists' departicipation not to create any anticompetitive conditions in Market I. Stated very simply, we do not see the existence of a system of third-party payment for dental care to have any effect upon the pricing of dental services in Market I and, so long as dentists do not react differently to Blue Shield patients then they do to other patients and do charge the same fees to Blue Shield patients as are charged to other patients, competition in Market I is wholly unaffected by the dentists' communications and conduct with respect to the question of participating dentist status.

We believe that we must consider, however, the question framed in *Indiana Federation*, even though Blue Shield declines to frame the question in that manner: whether the dentists' communications and concerted conduct has an anticompetitive effect among dentists in their policy of dealing with health care insurers. 745 F.2d at 1141. This framing of the question, translated into terms of market definition, addresses Market II (see, page 669, *supra*), the market in which participating dentist status is bought and sold.[12]

---

**11.** The UCR reimbursement mechanism, as we observed, discounts *some* dentists' usual fees, in exchange for which the dentist realizes certainty of payment. 574 F.Supp. at 469. The fact that *some* dentists' fees are discounted does not reasonably support the inference that the dentists' objections to the participating dentist mechanism had the purpose or effect of stabilizing or fixing prices for dental services or that the dentists' unwillingness to participate had an anticompetitive effect.

**12.** Another market might briefly be considered—the market in which various dental insurers sell various forms of prepaid dental insurance. Blue Shield can not reasonably claim any antitrust injury in that market as the result of the dentists' conduct. Blue Shield has 32 to 35% of all dental prepayment plans in this market. See, App. to dentists' brief in opposition to motion for summary judgment, Doc. 879, pages 52–53. The dentists, in support of their summary judgment motion, have presented very persuasive evidence that Blue Shield has

In Market II, unlike the equivalent market in *Indiana Federation,* there is here for all practical purposes only one seller, Blue Shield. This is significant because negotiations between the dentists and the insurers collectively, which in *Indiana Federation* was seen to be concerted action by the dentists to refuse to comply with certain of the insurers' conditions, here assumes the appearance of a boycott of Blue Shield as an entity because it is the principal seller of participating dentist status. Despite this appearance, we find this case to be materially indistinguishable from *Indiana Federation* because the concerns about which the dentists here were negotiating and which caused their concerted conduct were legitimate concerns relating to the quality of care and were not anticompetitive.

 Blue Shield maintains here that the dentists were motivated by economic considerations and not by quality of care considerations. However, we find there to be no evidence to reasonably support the inferences which Blue Shield would have us draw. Blue Shield claims in a conclusory fashion that the dentists' motivations were economic, but acknowledges that the evidence shows that the dentists did not want to be second-guessed in their diagnosis and treatment of patients, did not want to submit diagnostic aids and study models, and simply did not want third parties to intrude into the traditional dentist-patient relationship.[13] These views and motivations on the dentists' part may or may not have been socially desirable. So long as the dentists' motivations were not anticompetitive in purpose or in effect, these are matters outside the scope of the antitrust laws. The desirability or undesirability from a social perspective of the prospect of the defeat of the participating dentists system by dentists' non-participation is a matter which might be within the province of the Pennsylvania General Assembly to address; this Court may not address it if no antitrust violation has occurred.

We conclude that, by application of the rule of reason, there are no material questions of fact in dispute and the third-party defendants are entitled to judgment as a matter of law with respect to the dentists' and associations' rejection of Blue Shield participating dentist status. We add that, were we presented with facts demonstrating that the dentists had involved themselves in concerted action to negotiate with Blue Shield over such matters as fees and rates, or that the dentists or associations had taken or threatened any repercussions

not suffered antitrust injury in that market. While Blue Shield does not have a monopoly in that market, 574 F.Supp. at 472, it is beyond any question the dominant seller in that market.

Blue Shield's position that the dentists' departicipation has an anticompetitive effect in that market may be seen to be premised upon its contention that, but for the dentists' departicipation, it could sell for lower prices in that market and in that sense make that market more competitive. As we have seen, however, that contention is premised upon the unsupported speculation that Blue Shield's program "discounts" the cost of dental services. As we have said, we do not find the evidence to show this to be true and we found to the contrary in the earlier decision. If Blue Shield's objective is in fact to gain "control" of the dentists so as to discount the price of dental services, (1) we erred in our earlier decision, and (2) the dentists' concerted conduct, to the extent that it was motivated by economic factors, was pro-competitive because it sought merely to maintain a free market in Market I; that is, a market in which economic power is dispensed, competition is high, and a competitor stands to prosper upon his or her merits. Since the dentists are not in the insurance market in any sense, that market is not a relevant market for purposes of this case.

13. Blue Shield cites, as an example of the boycott against it, the PDA's refusal to print an advertisement in the PDA's publication by which Blue Shield would have sought to solicit additional participating dentists in central Pennsylvania. There is no doubt, of course, that PDA was and apparently remains opposed to the participating dentist concept. The rejection of Blue Shield's advertisement is but one of many manifestations of that opposition. The resolutions of the dentists who agreed that they would not participate is another. But the fact that many of the dentists and PDA opposed the concept of participation with Blue Shield and acted consistent with that philosophy in their affairs certainly does not of itself warrant the conclusion that their actions were anticompetitive. If that were so, protected speech and associational activities would be seriously jeopardized.

against dentists who were or sought to be participating dentists, or that the dentists who chose not to participate did not do so on the basis of their own independent judgment and free will but rather because of pressures brought to bear upon them by other dentists or the associations, we would reach a different conclusion.

### 5. BLUE SHIELD'S "SHAM ACTIVITIES" CONTENTIONS.

The other phase of activity by the dentists which Blue Shield claims to be in violation of the antitrust laws is the dentists' and associations' legislative and judicial efforts begun in 1977 and continuing to the present. Blue Shield claims that the purpose of these challenges, protests and legal actions was to coerce Blue Shield to change its business practices so as to reduce price competition among dentists and to preserve the private practice fee-for-service method of financing dental services. Blue Shield claims that these activities constituted "shams" to disguise anti-competitive conduct and therefore are not entitled to the general immunity attendant to persons' petitions to their Government under the *Noerr-Pennington* doctrine.[14]

Blue Shield, as a non-profit health service corporation and the promoter of the system of participating physicians and dentists involved in this case, is the embodiment of a legislatively enacted system of health care financing introduced into the affairs of a profession which was, in Blue Shield's phrase, "one of the last bastions of rugged individualism." Considering this background, it is not possible to view the approaches made by the dentists and their associations to the legislatures, the courts and the Commonwealth's administrative agencies as a "sham," something other than legitimate collective petitioning of the government. It is a more accurate view of the dentists' conduct, viewing all of the evidence relied upon by Blue Shield, to perceive of all of their conduct at issue in this case, from the very inception of the participating dentist system, as conduct

protected under the *Noerr-Pennington* doctrine. Even though the first court case was not brought until 1977 and the dentists' departicipation began in 1974, the evidence makes it clear that the actions taken by the dentists in their negotiations with Blue Shield, including their departicipation, were the direct result of the legislation and administrative agency rulings authorizing and establishing Blue Shield's participating dentist system. Blue Shield may itself be seen to be an instrument or agent of Pennsylvania government for the purposes of this case; that is, because it enjoys a special status as a non-profit health service corporation and may engage in practices which its profit-making insurance company competitors may not, it is quite possible to view the dentists' and associations' interactions with Blue Shield as in essence the petitioning of the government.

Blue Shield is an instrumentality of the government in the sense that it is a legislatively created entity (with respect to its characteristics of relevance to this case) designed, authorized and empowered to execute Pennsylvania public policy. It is characteristic of this special status enjoyed by Blue Shield that its enabling legislation causes it to distinguish between under-income and over-income patients for purposes of the billing of patients by participating doctors and dentists, a provision that is not generally consistent with the activities of the natural forces of a free market. However, we do not reach the question whether the dentists' concerted conduct, apart from their legislative and judicial efforts, are subject to the protection of the *Noerr-Pennington* doctrine, inasmuch as we have already decided that those activities did not violate the Sherman Act.

Little discussion need be devoted to the question whether the dentists' court actions, legislative lobbying and administrative agency litigation, commencing in 1977, falls within the *Noerr-Pennington* exception to the antitrust laws. Blue Shield says

---

14. See, footnote 9, *supra*.

it is sham activity, designed to force Blue Shield to change its practices. Blue Shield's assertion, however, is not supported by any facts or law. Blue Shield's argument is, in essence, that because the dentists were illegally boycotting the "participating dentist" program, operated by Blue Shield, any contemporaneous action in the various governmental bodies against Blue Shield was a sham. We conclude, however, that there was no illegal boycott. Moreover, there is no evidence in Blue Shield's facts to demonstrate that the dentists and associations were doing other than advocating the positions they had been advocating all along, many of which are involved in this case. Blue Shield's assertion that the dentists were involved in a sham is unsupported.

## III. CONCLUSION.

■ "... [C]ourts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter pro-competitive conduct." *Monsanto*, 465 U.S., at 762–764, 104 S.Ct. at 1470 [*Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)]; *Matsushita Elec. Ind. Co. v. Zenith Radio*, — U.S. —, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986).

This proposition is no less true as applied to the inference of an unlawful motive from circumstances not reasonably suggesting any such unlawful motive. By all appearances, the dentists' motive was pro-competitive. Assuming that Blue Shield proves all of the facts it has presented for purposes of summary judgment, we have no doubt that this is what we would find. The dentists did not seek to raise, lower or stabilize prices, but to preserve a market in which excellence was rewarded and inferior service penalized. We cannot reasonably deny summary judgment and require a trial when the inferences that Blue Shield seeks to have us draw are not reasonable. As in *Matsushita*, there is little reason to be concerned that by granting summary judgment, illegal conspiracies will be en-

couraged. There is no evidence or indication here, for example, that any significant number of dentists will be influenced to act in concert not to participate with Blue Shield, even though they perceive it to be in their best interest to do so, merely because other dentists or the dental associations are advocating that they not participate. There is no indication that the PDA or any of the other associations wield such power or potential power over dentists that a dentist could be penalized or harmed in any manner for participating with Blue Shield. That is not the theory of Blue Shield's case here, in any event.

The proposition that the learned professions are subject to the antitrust laws does not advance Blue Shield's cause nearly so far as Blue Shield would have it. It means, of course, that the dentists may not fix prices. Nor may they concertedly refuse to deal with other commercial entities for anticompetitive purposes. It does not mean that they lose the prerogative to discuss and agree upon issues generally affecting their professional status and practices.

We must consider the possible effects of a ruling that the dentists' agreement not to participate does not violate the antitrust laws. Will the participating dentist system be destroyed? Will dentists choose to departicipate *en masse*? We think not, but will assume otherwise, that this will happen. We note, again, that any evidence of coercion by dentists upon other dentists to departicipate would support an antitrust violation, as would evidence of efforts by the dentists to fix or stabilize prices in the dental marketplace. Therefore, we will assume that the dentists' *en masse* departicipation will be the result of their collective assessment that their practice should not be subjected to a set of conditions involving a third party in the treatment relationship between dentist and patient. The result is that, absent some action by the Commonwealth of Pennsylvania government, or some modification by Blue Shield of some of the components of its participating dentist program to make it less objectionable to the dentists, Blue Shield will be rele-

gated to providing a form of dental insurance contract which involves only two parties, Blue Shield and the insured individual or group; *i.e.*, a simple reimbursement or partial reimbursement for dental costs to the dental patient. We may find that result regretable, but we do not find it to be anticompetitive. We see no reason, in the evidence or in logic, why this result should affect the price of dental services. Only if we were to assume for some reason that the market for dental services is not a free market could we conclude that the failure of the participating dentist system to work as Blue Shield hoped it would work is the result of anticompetitive forces or is anticompetitive in effect. Blue Shield has not asked us to make such an assumption in this case, nor is there evidence in this case to support such an assumption. On the contrary, Blue Shield's description of a market characterized by rugged individualism is perfectly consistent with all of the evidence in this case—the non-participating dentists' consistent theme and objective has been to remain independent entities in every possible respect. The dentists did not act in concert to eliminate the economic advantages of superior ability, efficiency and products or to ameliorate the economic disadvantages of an inferior dental practice; quite the contrary, they acted to preserve these. Unless we radically misunderstand the concept of free trade and the objectives of the antitrust laws, this is not the sort of activity that these laws seek to prevent.

We recognize that when motivation and intent are in issue, summary judgment is not very likely to be appropriate. It is important here to analyze this case very precisely in relationship to that principle. When we do, we find that there is really not a genuine material factual dispute relating to motivation and intent. The picture is clear, and it is this: Some individual dentists did form and express a view of their position vis-a-vis Blue Shield and the participating dentist concept that incorporated the notion that Blue Shield should be driven out of business through dentists' departicipation. These individual dentists are not defendants in this case. These individual dentists' statements and conduct are not, in view of all of the evidence, either representative or indicative of the motivation and intent of the dentists and associations generally. The motivation and intent of the dentists and associations generally was directed against the overall body of rules and practices associated with the participating dentist concept. It was the dentists' and associations' view, which was entirely reasonable and accurate, that if the dentists were to become participating dentists on a universal or nearly universal basis, dentists' independence and the traditional dentist-patient relationship would be largely sacrificed and dentists would come under the control of third-party insurers for purposes of a very broad range of the dentist's affairs including his treatment decisions and his billing practices. Thus, there is no genuine material factual dispute as to the question whether the dentists and associations were motivated by a desire to harm Blue Shield competitively. There is no material evidence of an effort on the dentists' part to harm Blue Shield as an entity in any market, and certainly not as a purchaser of dental services in Market I. The evidence upon which Blue Shield relies, upon a structured and precise review of it, reasonably supports no more than the inference that many of the dentists and their associations sought to defeat the success of a major systemic change in the practice of dentistry and in the delivery of dental services. This dispute between the dentists and the forces seeking to change the way that dental services are administered will no doubt give rise to many legal and policy issues in various forums for many years to come; however, in the context of the Sherman Act, this objective and these efforts on the part of the dentists may not reasonably be seen to be anticompetitive.

For these reasons, the third-party counterclaim defendants' motion for summary judgment will be granted. An appropriate Order will be issued.